ARBINO *v*. JOHNSON & JOHNSON ET AL.

**[Cite as *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948.]**

*Trials – Damages – R.C. 2315.18 – Cap on noneconomic damages is constitutional and does not violate right to jury, right to due process, right to remedy, right to open court, or right to equal protection – Cap on noneconomic damages does not violate separation of powers – R.C. 2315.21 – Cap on punitive damages is constitutional and does not violate right to jury, right to due process, right to remedy, right to open court, or right to equal protection — Cap on punitive damages does not violate separation of powers or single-subject rule.*

(No. 2006-1212 – Submitted May 1, 2007 – Decided December 27, 2007.)

ON ORDER from the United States District Court for the Northern District of Ohio, Western Division, Certifying State Law Questions, No. 3:06 CV 40010.

_____

SYLLABUS OF THE COURT

1. R.C. 2315.18 does not violate the right to a trial by jury, the right to a remedy, the right to an open court, the right to due process of law, the right to equal protection of the laws, or the separation of powers, and is therefore constitutional on its face.

2. R.C. 2315.21 does not violate the right to a trial by jury, the right to a remedy, the right to an open court, the right to due process of law, the right to equal protection of the laws, or the separation of powers, and is therefore constitutional on its face.

_____

**MOYER, C.J.**

I. Introduction

**{¶ 1}** Petitioner Melisa Arbino initiated a product-liability action against respondents Johnson & Johnson, Ortho-McNeil Pharmaceutical, Inc., and Johnson & Johnson Pharmaceutical Research & Development, L.L.C. (collectively, "Johnson & Johnson") in 2006. She alleges that she suffered blood clots and other serious medical side effects from using the Ortho Evra Birth Control Patch, a hormonal birth-control medication that Johnson & Johnson created.

**{¶ 2}** The case was filed in the United States District Court for the Southern District of Ohio. Arbino's complaint contains challenges to the constitutionality of four tort-reform statutes implemented by Am.Sub.S.B. No. 80 of the 125th General Assembly ("S.B. 80") and made effective on April 7, 2005. Arbino then filed a motion for partial summary judgment on these challenges, leading respondent state of Ohio to intervene in the matter. While this motion was pending, the federal Judicial Panel on Multidistrict Litigation consolidated the case with other claims relating to the Ortho Evra patch before Judge David A. Katz in the United States District Court for the Northern District of Ohio, Western Division.

**{¶ 3}** Judge Katz certified four questions of state law for review pursuant to S.Ct.Prac.R. XVIII. We accepted three[1] of the questions:

**{¶ 4}** 1. "Is Ohio Revised Code § 2315.18 [limiting noneconomic damages in tort actions], as amended by Senate Bill 80, effective, April 7, 2005, unconstitutional on the grounds as stated by the Plaintiffs?"

**{¶ 5}** 2. "Is Ohio Revised Code § 2315.20 [admissibility of collateral-benefit evidence in tort actions], as amended by Senate Bill 80, effective, April 7, 2005, unconstitutional on the grounds as stated by the Plaintiffs?"

---

1. The question submitted for consideration but not accepted for review was "Is Ohio Revised Code § 2315.19, as amended by Senate Bill 80, effective, April 7, 2005, unconstitutional on the grounds as stated by the Plaintiffs?"

**{¶ 6}** 3. "Is Ohio Revised Code § 2315.21 [limiting punitive damages in tort actions], as amended by Senate Bill 80, effective, April 7, 2005, unconstitutional on the grounds as stated by the Plaintiffs?" 110 Ohio St.3d 1462, 2006-Ohio-4288, 852 N.E.2d 1212.

**{¶ 7}** Arbino argues that these statutes violate several provisions of the Ohio Constitution: the right to trial by jury in Section 5, Article I; the right to a remedy and the right to an open court in Section 16, Article I; the right to due process of law in Section 16, Article I; the right to equal protection of the laws in Section 2, Article I; the separation of powers, specifically the prohibition on the General Assembly exercising general judicial powers in Section 32, Article II; and the single-subject rule in Section 15(D), Article II.

**{¶ 8}** For the following reasons, we hold that R.C. 2315.18 and 2315.21 are facially constitutional. However, we decline to review R.C. 2315.20 because Arbino lacks standing to challenge that statute.

## II. Tort Reform in Ohio and Stare Decisis

**{¶ 9}** Before engaging in a specific analysis of these issues, it is necessary to briefly review the major tort-reform laws enacted by the General Assembly in recent history. Doing so provides the proper context for our decision and frames the necessary discussion of stare decisis.

**{¶ 10}** Since 1975, the General Assembly has adopted several so-called tort-reform acts, which were inevitably reviewed by this court. In the course of this review, we have examined several specific provisions that are similar in language and purpose to those at issue here; all of these similar statutes have been declared unconstitutional.

**{¶ 11}** The first reform provision we reviewed was former R.C. 2307.43, which was passed in the Ohio Medical Malpractice Act of 1975, Am.Sub.H.B. No. 682, 136 Ohio Laws, Part II, 2809 ("H.B. 682"). This statute placed a $200,000 cap on general medical-malpractice damages not involving death, with

no exceptions for those suffering severe injuries. See *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 686–687, 576 N.E.2d 765. The General Assembly passed this legislation to combat a perceived malpractice-insurance crisis. Id.

**{¶ 12}** Although it took several years for a challenge to be raised, we ultimately held that R.C. 2307.43 violated the due-process protections of the Ohio Constitution. We specifically noted that " '[i]t is irrational and arbitrary to impose the cost of the intended benefit to the general public solely upon a class consisting of those most severely injured by medical malpractice.' " Id. at 691, 576 N.E.2d 765, quoting *Nervo v. Pritchard* (June 10, 1985), Stark App. No. CA-6560, at 8.

**{¶ 13}** The General Assembly's next major enactment was the Tort Reform Act of 1987, Am.Sub.H.B. No. 1, 142 Ohio Laws, Part I, 1661 ("H.B. 1"), which sought to change civil-justice and insurance law to alleviate another "insurance crisis." See *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 419–420, 633 N.E.2d 504.

**{¶ 14}** In *Sorrell*, we examined one facet of this law, R.C. 2317.45, which placed a significant limitation on the collateral-source rule adopted in *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 52 O.O.2d 395, 263 N.E.2d 235. The H.B. 1 version of R.C. 2317.45 required the trial court to subtract certain collateral benefits from a plaintiff's final award of compensatory damages. Former R.C. 2317.45(B)(2)(c)(i), 142 Ohio Laws, Part I, 1696 (effective Jan. 5, 1988). We held that this mandatory deduction of collateral benefits violated the right to a jury trial, due process, equal protection, and the right to a remedy. See *Sorrell*, 69 Ohio St.3d 415, 633 N.E.2d 504, syllabus.

**{¶ 15}** In *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 644 N.E.2d 298, we reviewed former R.C. 2323.57, another tort-reform statute. This statute required trial courts to order awards of future damages in excess of $200,000 in medical-malpractice actions to be paid in a series of periodic

4

payments upon the motion of any party. Former R.C. 2323.57(C), 142 Ohio Laws, Part II, 3333 (effective Oct. 20, 1987). We deemed that statute unconstitutional as a violation of the right to a jury trial and of the Due Process Clause of the Ohio Constitution. Id., paragraph one of the syllabus.

{¶ 16} We returned to our review of H.B. 1 in *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 644 N.E.2d 397, in which we examined former R.C. 2315.21(C)(2). That statute required a trial judge to determine the amount of punitive damages to be awarded in a tort action, even when the trier of fact was a jury. Former R.C. 2315.21(C)(2), 142 Ohio Laws, Part I, 1690–1691 (effective Jan. 5, 1988). We struck this section as a violation of the right to a jury trial in the Ohio Constitution. *Zoppo*, paragraph two of the syllabus.

{¶ 17} Finally, the General Assembly passed substantial reforms in 1997 with Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867 ("H.B. 350"). The legislation amended, enacted, or repealed over 100 sections of the Revised Code contained in 18 titles and 38 chapters. Among other things, it modified the collateral-source rule in tort actions to require the trier of fact to consider but not automatically set off collateral benefits (former R.C. 2317.45), capped punitive damages and allowed the trier of fact to determine damages up to the cap in tort and products-liability claims (former R.C. 2315.21(D)(1)), and capped noneconomic damages at different levels, with higher limits for permanent injuries (former R.C. 2323.54).

{¶ 18} Although we examined and discussed several subsections of the law in our review, we ultimately found H.B. 350 to be unconstitutional in toto as a violation of the separation of powers and the single-subject clause of the Ohio Constitution. *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraphs two and three of the syllabus.

{¶ 19} Citing *Morris*, *Sorrell*, *Galayda*, *Zoppo*, and *Sheward* as precedent, Arbino argues that the portions of S.B. 80 at issue here are functionally identical

to the statutes this court held to be unconstitutional in those cases. She alleges that the principle of stare decisis therefore requires us to declare the statutes here unconstitutional as well. We disagree.

{¶ 20} The protracted interbranch tension on this subject establishes at least two key points. First, tort reform has been a major issue of concern in this state over the past several decades and remains one today. Ohio is hardly unique in this regard, as such reforms have been raised in nearly every state in the nation. State legislatures and judiciaries have differed widely in their responses to this issue, and a definite split in authority is clear. See Section IV. The federal judiciary has been drawn to the issue as well, with the United States Supreme Court offering guidance on several key issues over the past few years, most notably regarding punitive-damages awards.[2]

{¶ 21} A fundamental principle of the constitutional separation of powers among the three branches of government is that the legislative branch is "the ultimate arbiter of public policy." *State ex rel. Cincinnati Enquirer, Div. of Gannett Satellite Information Network v. Dupuis*, 98 Ohio St.3d 126, 2002-Ohio-7041, 781 N.E.2d 163, ¶ 21. It necessarily follows that the legislature has the power to continually create and refine the laws to meet the needs of the citizens of Ohio. The fact that the General Assembly has repeatedly sought to reform some aspects of the civil tort system for over 30 years demonstrates the continuing prominence of this issue.

{¶ 22} Second, even considering the numerous opinions by this court on this issue, the basic constitutionality of tort-reform statutes is hardly settled law. Our prior review has focused on certain unconstitutional facets of the prior tort-

---

2. See, e.g., *State Farm Mut. Auto Ins. Co. v. Campbell* (2003), 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (excessive punitive-damages awards violate a defendant's right of due process); *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001), 532 U.S. 424, 121 S.Ct. 1678, 149 L.Ed.2d 674 (requiring courts of appeals to review punitive-damages awards de novo); *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (establishing three guideposts for reviewing punitive-damages awards for excessiveness).

reform laws that can be addressed to create constitutionally valid legislation. We have not dismissed all tort reform as an unconstitutional concept.

{¶ 23} While stare decisis applies to the rulings rendered in regard to specific statutes, it is limited to circumstances "where the facts of a subsequent case are substantially the same as a former case." *Rocky River v. State Emp. Relations Bd.* (1989), 43 Ohio St.3d 1, 5, 539 N.E.2d 103. We will not apply stare decisis to strike down legislation enacted by the General Assembly merely because it is similar to previous enactments that we have deemed unconstitutional. To be covered by the blanket of stare decisis, the legislation must be phrased in language that is substantially the same as that which we have previously invalidated.

{¶ 24} A careful review of the statutes at issue here reveals that they are more than a rehashing of unconstitutional statutes. In its continued pursuit of reform, the General Assembly has made progress in tailoring its legislation to address the constitutional defects identified by the various majorities of this court. The statutes before us here are sufficiently different from the previous enactments to avoid the blanket application of stare decisis and to warrant a fresh review of their individual merits.

### III. Standard of Review

{¶ 25} It is difficult to prove that a statute is unconstitutional. All statutes have a strong presumption of constitutionality. See *Sorrell*, 69 Ohio St.3d at 418–419, 633 N.E.2d 504. Before a court may declare unconstitutional an enactment of the legislative branch, "it must appear beyond a reasonable doubt that the legislation and constitutional provisions are clearly incompatible." *State ex rel. Dickman v. Defenbacher* (1955), 164 Ohio St. 142, 57 O.O. 134, 128 N.E.2d 59, paragraph one of the syllabus.

{¶ 26} A party seeking constitutional review of a statute may proceed in one of two ways: present a facial challenge to the statute as a whole or challenge

the statute as applied to a specific set of facts. *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37. Instead of arguing that these statutes are unconstitutional as applied to the facts of her case, Arbino has raised a facial challenge to each of them. To successfully present such a challenge, she must demonstrate that there is no set of circumstances in which each statute would be valid. Id., citing *United States v. Salerno* (1987), 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697. "The fact that a statute might operate unconstitutionally under some plausible set of circumstances is insufficient to render it wholly invalid." *Harrold* at ¶ 37. Mindful of this strict standard of review, we proceed to the merits of the certified questions.

A. Limits on Noneconomic Damages in R.C. 2315.18

{¶ 27} The first certified question concerns the constitutionality of R.C. 2315.18. The statute provides a basic procedure for the imposition of damages in certain tort actions.[3] After a verdict has been reached for the plaintiff in one of the specified tort actions, the court (in a bench trial) will enter findings of fact or the jury (in a jury trial) will return a general verdict accompanied by answers to interrogatories. R.C. 2315.18(D). In either case, these findings or interrogatories will specify both the total compensatory damages recoverable by the plaintiff and the portions of those damages representing economic and noneconomic losses.[4] Id. at (D)(1) through (3).

---

3. This statute does not apply to tort actions in the Court of Claims or against political subdivisions under R.C. Chapter 2744, nor does it apply to actions for wrongful death, medical or dental malpractice, or breach of contract. R.C. 2315.18(A)(7) and (H)(1) through (3).

4. {¶ a} R.C. 2315.18(A)(2) defines "economic loss" as:
   {¶ b} "(a) All wages, salaries, or other compensation lost as a result of an injury or loss to person or property that is a subject of a tort action;
   {¶ c} "(b) All expenditures for medical care or treatment, rehabilitation services, or other care, treatment, services, products, or accommodations as a result of an injury or loss to person or property that is a subject of a tort action;
   {¶ d} "(c) Any other expenditures incurred as a result of an injury or loss to person or property that is a subject of a tort action, other than attorney's fees incurred in connection with that action."

**{¶ 28}** Thereafter, the court must enter judgment for the plaintiff for the amount of economic damages, without limitation, as determined by the trier of fact. Id. at (B)(1) and (E)(1). For noneconomic damages, the court must limit recovery to the greater of (1) $250,000 or (2) three times the economic damages up to a maximum of $350,000, or $500,000 per single occurrence. Id. at (B)(2). However, these limits on noneconomic damages do not apply if the plaintiff suffered "[p]ermanent and substantial physical deformity, loss of use of a limb, or loss of a bodily organ system," or "[p]ermanent physical functional injury that permanently prevents the injured person from being able to independently care for self and perform life-sustaining activities." Id. at (B)(3)(a) through (b).

**{¶ 29}** Arbino challenges this statute on several grounds.

1. Right to a Trial by Jury

**{¶ 30}** Arbino initially contends that R.C. 2315.18 violates the right to a trial by jury. The relevant constitutional language states that "[t]he right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." Section 5, Article I, Ohio Constitution.

**{¶ 31}** This right serves as one of the most fundamental and long-standing rights in our legal system, having derived originally from the Magna Carta. See *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1. It was "[d]esigned to prevent government oppression and to promote the fair resolution of factual issues." *Arrington v. DaimlerChrysler Corp.*, 109 Ohio St.3d 539**,** 2006-Ohio-3257, 849 N.E.2d 1004, ¶ 21. As Thomas Jefferson stated, the right to trial by jury is "the only anchor, ever yet imagined by man, by which a

---

{¶ e} "Noneconomic loss" is defined as "nonpecuniary harm that results from an injury or loss to person or property that is a subject of a tort action, including, but not limited to, pain and suffering, loss of society, consortium, companionship, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, or education, disfigurement, mental anguish, and any other intangible loss." R.C. 2315.18(A)(4).

government can be held to the principles of it's [sic] constitution." Letter from Thomas Jefferson to Thomas Paine (July 11, 1789), reprinted in 15 The Papers of Thomas Jefferson (Boyd Ed.1958) 269.

{¶ 32} However, the right is not absolute. See *Arrington* at ¶ 22. Section 5, Article I guarantees a right to a jury trial only for those causes of action in which the right existed in the common law when Section 5 was adopted. See *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus. It is settled that the right applies to both negligence and intentional-tort actions. See *Arrington* at ¶ 24.

{¶ 33} Arbino claims that this provision necessarily includes the right to have a jury determine the full amount of a plaintiff's damages. Thus, she argues that any limitations on the process, such as the damages caps in R.C. 2315.18, unconstitutionally infringe upon this "inviolate" right. We are not persuaded.

{¶ 34} To properly approach this issue, one must define what exactly is guaranteed under this right. We are guided by long-standing precedent in this regard: "The right thus intended to be secured by the constitution, was the right of trial by jury as it was recognized by the common law; and within the right thus secured is the right of either party, in an action for the recovery of money only, *to demand that the issues of fact therein be tried by a jury*." (Emphasis added.) *Dunn v. Kanmacher* (1875), 26 Ohio St. 497, 502–503. In short, the right to trial by jury protects a plaintiff's right to have a jury determine all issues of fact in his or her case. See *Sorrell*, 69 Ohio St.3d at 422, 633 N.E.2d 504, citing *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 81, 545 N.E.2d 76 (Douglas, J., concurring in part and dissenting in part). Because the extent of damages suffered by a plaintiff is a factual issue, it is within the jury's province to determine the amount of damages to be awarded. See *Sorrell*.

{¶ 35} Section 5, Article I of the Ohio Constitution clearly protects this fact-finding function from outside interference. Any law that prevents the jury

10

from completing this task or allows another entity to substitute its own findings of fact is unconstitutional. We reaffirmed this principle in *Sorrell* by striking down a statute that required a court to determine any collateral benefits received by a plaintiff and deduct them from a jury award, regardless of whether those benefits were duplicated in the award. *Sorrell,* 69 Ohio St.3d at 422, 633 N.E.2d 504. This statute was unconstitutional because it allowed courts to ignore the jury's finding of facts on collateral benefits. Id.

{¶ 36} However, the fact that the jury's fact-finding function is protected does not mean jury awards are insulated from all outside influences.

{¶ 37} So long as the fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings, awards may be altered *as a matter of law*. There is no dispute that the right to a trial by jury does not extend to the determination of questions of law. See *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 292, 595 N.E.2d 862. Thus, without violating the Constitution, a court may apply the law to the facts determined by a jury.

{¶ 38} We have recognized several ways in which a court may apply the law to change a jury award of damages without running afoul of the Constitution. For example, courts have the inherent authority to order remittiturs to reduce jury awards when they deem the amount to be excessive based on the facts found by the jury. See *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 444, 715 N.E.2d 546 (noting, though, that the successful plaintiff must consent to such an order).

{¶ 39} Additionally, there are numerous statutes that treble jury damages awards in certain causes of action. See, e.g., R.C. 901.51 (unauthorized removal of timber), 1331.08 (Valentine Act violations), 1345.09 (Consumer Sales Practices Act violations), 2307.61 (willful damage to or theft of property), 2923.34(E) (engaging in a pattern of corrupt activity), and 4905.61 (public-

utilities-law violations). In each of these statutes, the General Assembly demonstrated a clear policy choice to modify the amount of jury awards. We have never held that the legislative choice to *increase* a jury award as a matter of law infringes upon the right to a trial by jury; the corresponding *decrease* as a matter of law cannot logically violate that right. See *Hemmings v. Tidyman's, Inc.* (C.A.9, 2002), 285 F.3d 1174, 1202.

{¶ 40} So it must be with R.C. 2315.18. By limiting noneconomic damages for all but the most serious injuries, the General Assembly made a policy choice that noneconomic damages exceeding set amounts are not in the best interest of the citizens of Ohio. The statute is distinguishable from those allowing courts to substitute their own findings of fact on collateral benefits or requiring repayment plans that "further reduce the jury's award of damages already once reduced to present value." *Galayda*, 71 Ohio St.3d at 425, 644 N.E.2d 298. Courts must simply apply the limits as a matter of law to the facts found by the jury; they do not alter the findings of facts themselves, thus avoiding constitutional conflicts.

{¶ 41} Such limitations are also permissible under the analogous Seventh Amendment right to a jury trial in the federal system. "Federal courts uniformly have held that statutory damages caps do not violate the Seventh Amendment, largely because a court does not 'reexamine' a jury's verdict or impose its own factual determination regarding what a proper award might be. Rather, the court simply implements a legislative policy decision to reduce the amount recoverable to that which the legislature deems reasonable." (Footnote omitted.) *Estate of Sisk v. Manzanares* (D.Kan.2003), 270 F.Supp.2d 1265, 1277–1278.

{¶ 42} Because R.C. 2315.18 follows these principles, it does not offend the right to a trial by jury under Section 5, Article I of the Ohio Constitution.

2. Open Courts and Right to a Remedy

{¶ 43} Arbino also argues that R.C. 2315.18 violates Ohio's "open courts" and "right to a remedy" provisions. The Constitution provides: "*All courts shall be open*, and every person, for an injury done him in his land, goods, person, or reputation, *shall have remedy* by due course of law, and shall have justice administered without denial or delay." (Emphasis added.) Section 16, Article I, Ohio Constitution.

{¶ 44} The definition of these rights is well settled. "When the Constitution speaks of remedy and injury to person, property, or reputation, it requires an opportunity granted at a meaningful time and in a meaningful manner." *Hardy v. VerMeulen* (1987), 32 Ohio St.3d 45, 47, 512 N.E.2d 626. We have interpreted this provision to prohibit statutes that effectively prevent individuals from pursuing relief for their injuries. See, e.g., *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460, 466, 639 N.E.2d 425 (finding a statute of repose unconstitutional because it deprived certain plaintiffs of the right to sue before they were aware of their injuries); *Gaines v. Preterm-Cleveland, Inc.* (1987), 33 Ohio St.3d 54, 60–61, 514 N.E.2d 709 (declaring a statute of repose unconstitutional because it did not give certain litigants the proper time to file an action following discovery of their claims).

{¶ 45} A statute need not "completely abolish the right to open courts" to run afoul of this section. *Sorrell*, 69 Ohio St.3d at 426, 633 N.E.2d 504. Any enactment that eliminates an individual's right to a judgment or to a verdict properly rendered in a suit will also be unconstitutional. See id. Thus, we struck down the statute in *Sorrell* under circumstances "where the collateral source benefits reduce *the entire jury award*." (Emphasis added.) Id. When an individual is wholly foreclosed from relief after a verdict is rendered in his or her favor, the rights to "a meaningful remedy and open courts become hollow rights hardly worth exercising." Id.

{¶ 46} Arbino states that R.C. 2315.18 violates this provision because it "denies *any* recovery for noneconomic damages for the increment of harm greater than $250,000." (Emphasis sic.) We disagree.

{¶ 47} Although R.C. 2315.18 does limit certain types of noneconomic damages, those limits do not wholly deny persons a remedy for their injuries. Injured persons not suffering the catastrophic injuries in R.C. 2315.18(B)(3) (for which there are no damages limits) may still recover their full economic damages and up to $350,000 in noneconomic damages, as well as punitive damages. These available remedies are "meaningful" ones under the Constitution. While the statute prevents some plaintiffs from obtaining the same dollar figures they may have received prior to the effective date of the statute, it neither forecloses their ability to pursue a claim at all nor "completely obliterates the entire jury award." *Sorrell*, 69 Ohio St.3d at 426, 633 N.E.2d 504. Therefore, R.C. 2315.18 does not violate the right to a remedy or the right to an open court under Section 16, Article I of the Ohio Constitution.

3. Due Course of Law/Due Process

{¶ 48} Arbino's next challenge to R.C. 2315.18 also arises from Section 16, Article I, specifically, the "due course of law" provision. We have recognized this provision as the equivalent of the "due process of law" protections in the United States Constitution. *Sorrell*, 69 Ohio St.3d at 422–423, 633 N.E.2d 504, citing *Direct Plumbing Supply Co. v. Dayton* (1941), 138 Ohio St. 540, 544, 21 O.O. 422, 38 N.E.2d 70.

{¶ 49} When reviewing a statute on due-process grounds, we apply a rational-basis test unless the statute restricts the exercise of fundamental rights. *Morris*, 61 Ohio St.3d at 688–689, 576 N.E.2d 765; *Sorrell,* 69 Ohio St.3d at 423, 633 N.E.2d 504. Because we have already concluded that R.C. 2315.18 violates neither the right to a jury trial nor the right to a remedy, we must find it valid under the rational-basis test " '[1] if it bears a real and substantial relation to the

14

public health, safety, morals or general welfare of the public and [2] if it is not unreasonable or arbitrary.' " *Mominee v. Scherbarth* (1986), 28 Ohio St.3d 270, 274, 28 OBR 346, 503 N.E.2d 717, quoting *Benjamin v. Columbus* (1957), 167 Ohio St. 103, 4 O.O.2d 113, 146 N.E.2d 854, paragraph five of the syllabus. Under this test, we must examine the record to determine whether there is evidence to support such a relationship. See *Morris,* 61 Ohio St.3d at 690, 576 N.E.2d 765.

{¶ 50} As a preliminary matter, Arbino argues that we have consistently held that there is no rational relationship "between restrictions on recovery in meritorious cases of serious injury and the deterrence of meritless claims." She cites both *Morris* and *Sheward* for this proposition, arguing that the type of noneconomic-damages caps found in R.C. 2315.18 can never be justified under the Due Process Clause.

{¶ 51} However, those cases did not create a bright-line rule that there can never be a real and substantial relation between a restriction on recovery and a legitimate governmental interest. In *Morris*, we found no evidence in the record *of that case* demonstrating a connection between awards in excess of the statutory limits and rising malpractice-insurance rates. *Morris*, 61 Ohio St.3d at 690, 576 N.E.2d 765 ("We are unable to find, either in the *amici* briefs or elsewhere, any evidence to buttress the proposition that there is a rational connection").

{¶ 52} Further, although *Sheward* offered an abundance of dicta on several statutes in H.B. 350, the ultimate holding was that H.B. 350 was unconstitutional in toto as a violation of the separation of powers and of the single-subject clause. *Sheward*, 86 Ohio St.3d 451, 715 N.E.2d 1062, paragraphs two and three of the syllabus. The dicta pronounced on other issues does not extend to the statute here. Thus, we must now determine whether R.C. 2315.18 meets the two prongs of the rational-basis test.

a. Real and substantial relation to the general welfare of the public

**{¶ 53}** The record here reveals that the General Assembly reviewed several forms of evidence and made numerous findings relative to R.C. 2315.18. In an uncodified section of S.B. 80, it found that the current state of the civil litigation system "represents a challenge to the economy of the state of Ohio." S.B. 80, Section 3(A)(1), 150 Ohio Laws, Part V, 8024. This finding was supported by (1) a National Bureau of Economic Research study showing that states adopting tort reforms experienced growth in employment, productivity, and total output, (2) a 2002 White House Council on Economic Advisors study equating the cost of tort litigation to a 2.1 percent wage and salary tax, a 1.3 percent personal-consumption tax, and a 3.1 percent capital-investment-income tax, (3) a Harris Poll of 928 senior corporate attorneys showing that the litigation environment in a state greatly affected the business decisions of their companies, (4) a Tillinghast-Towers Perrin study showing that the tort system failed to return even 50 cents for every dollar to injured plaintiffs and that the cost of the national tort system grew at a record rate in 2001, with a cost equivalent to a five percent tax on wages, and (5) testimony from Ohio Department of Development Director Bruce Johnson on the rising costs of the tort system, which he believed were putting Ohio businesses at a disadvantage and hindering development. S.B. 80 at Section 3(A)(3)(a) through (f), 150 Ohio Laws, Part V, 80021-80025.

**{¶ 54}** In addition to these general economic concerns, the General Assembly noted that noneconomic damages are difficult to calculate and lack a precise economic value. Id. at Section 3(A)(6)(a). It further concluded that such damages, which should be awarded for a plaintiff's pain and suffering and similar injuries as set forth in R.C. 2315.18(A)(4), are inherently subjective and susceptible to influence from irrelevant factors, such as the defendant's wrongdoing. Id. at Section 3(A)(6)(d). It also recognized that inflated damages awards were likely under the then current system and that the cost of these awards was being passed on to the general public. Id. at Section 3(A)(6)(d) and (e).

{¶ 55} Viewing these findings as a whole, we conclude that R.C. 2315.18 bears a real and substantial relation to the general welfare of the public. The General Assembly reviewed evidence demonstrating that uncertainty related to the existing civil litigation system and rising costs associated with it were harming the economy. It noted that noneconomic damages are inherently subjective and thus easily tainted by irrelevant considerations. The implicit, logical conclusion is that the uncertain and subjective system of evaluating noneconomic damages was contributing to the deleterious economic effects of the tort system.

{¶ 56} Unlike the records in *Morris* and *Sorrell*, which we criticized as lacking evidence demonstrating a rational connection between the tort reforms taken and the public good to be achieved, the record here draws a clear connection between limiting uncertain and potentially tainted noneconomic-damages awards and the economic problems demonstrated in the evidence. See *Morris*, 61 Ohio St.3d at 690, 576 N.E.2d 765; *Sorrell*, 69 Ohio St.3d at 423, 633 N.E.2d 504. In seeking to correct these problems, the General Assembly acted in the public's interests, which is all that is required under the first prong of the due-process analysis.

{¶ 57} Arbino assails the specific evidence amassed by the General Assembly in this regard, labeling it "threadbare" and "specious." She challenges the persuasiveness of these findings and argues that the crisis proposed by the evidence is nonexistent. In doing so, she asks us to evaluate the information relied upon by the General Assembly and come to our own conclusions as to whether R.C. 2315.18 was warranted.

{¶ 58} Such an intensive reexamination is beyond the scope of our review. In an equal-protection context, we noted in *State v. Williams* (2000), 88 Ohio St.3d 513, 531, 728 N.E.2d 342, that "we are to grant substantial deference to the predictive judgment of the General Assembly" under a rational-basis review. Further, as the United States Supreme Court has stated, "it is not the

17

function of the courts to substitute their evaluation of legislative facts for that of the legislature." *Minnesota v. Clover Leaf Creamery Co.* (1981), 449 U.S. 456, 470, 101 S.Ct. 715, 66 L.Ed.2d 659. Finding that the General Assembly's review of the evidence yielded a statute that bears a real and substantial relation to the general welfare of the public, we need not cross-check its findings to ensure that we would agree with its conclusions.

b. Neither arbitrary nor unreasonable

{¶ 59} The second prong of the rational-basis test asks whether the statute is arbitrary or unreasonable. In *Morris*, we found that the damages caps violated this prong because they imposed the cost of the intended benefit to the public solely upon those most severely injured. Id., 61 Ohio St.3d at 690–691, 576 N.E.2d 765. We repeated this concern in *Sheward*, albeit in dicta. *Sheward*, 86 Ohio St.3d at 490, 715 N.E.2d 1062.

{¶ 60} R.C. 2315.18 alleviates this concern by allowing for limitless noneconomic damages for those suffering catastrophic injuries. R.C. 2315.18(B)(3)(a) and (b). Arbino suggests that even with this exception for catastrophic injuries, the noneconomic-damages limitations remain unreasonable and arbitrary. She argues further that it is irrational to strike a statute for imposing the costs of a public benefit on the most severely injured, but not the "second-most severely injured."

{¶ 61} At some point, though, the General Assembly must be able to make a policy decision to achieve a public good. Here, it found that the benefits of noneconomic-damages limits could be obtained without limiting the recovery of individuals whose pain and suffering is traumatic, extensive, and chronic, and by setting the limits for those not as severely injured at either $250,000 or $350,000. Even Arbino acknowledges that the vast majority of noncatastrophic tort cases do not reach that level of damages. Id. The General Assembly's

18

decision is tailored to maximize benefits to the public while limiting damages to litigants. The logic is neither unreasonable nor arbitrary.

{¶ 62} For those reasons, R.C. 2315.18 does not violate the due-process protections in Section 16, Article I of the Ohio Constitution.

4. Equal Protection

{¶ 63} Arbino also challenges R.C. 2315.18 on equal-protection grounds. The Ohio Constitution states: "All political power is inherent in the people. Government is instituted for their equal protection and benefit." Section 2, Article I, Ohio Constitution. We have interpreted this provision as the equivalent of the federal Equal Protection Clause. See *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶7.

a. Standard of review

{¶ 64} The first step in an equal-protection analysis is determining the proper standard of review. When legislation infringes upon a fundamental constitutional right or the rights of a suspect class, strict scrutiny applies. See *State v. Williams,* 88 Ohio St.3d at 530, 728 N.E.2d 342. If neither a fundamental right nor a suspect class is involved, a rational-basis test is used. See *Menefee v. Queen City Metro* (1990), 49 Ohio St.3d 27, 29, 550 N.E.2d 181.

{¶ 65} In arguing for strict scrutiny, Arbino alleges that R.C. 2315.18 infringes on both a fundamental right (the right to a jury trial) and the rights of suspect classes (she specifically claims that damages caps disproportionately affect women, children, minorities, the elderly, and people with low incomes). We rejected the fundamental-right argument in Section III.A.1 above. Further, even if we accepted Arbino's contention that the noneconomic-damages caps disproportionately affect certain classes, facially neutral laws that may have such an impact do not violate the Equal Protection Clause. See *Washington v. Davis* (1976), 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597; see also *Massachusetts*

*Personnel Admr. v. Feeney* (1979), 442 U.S. 256, 273, 99 S.Ct. 2282, 60 L.Ed.2d 870 ("the Fourteenth Amendment guarantees equal laws, not equal results").

**{¶ 66}** Finding R.C. 2315.18 to be facially neutral, we apply the rational-basis test. This test requires that a statute be upheld if it is rationally related to a legitimate government purpose. See *Williams*, 88 Ohio St.3d at 530, 728 N.E.2d 342. Under such a review, a statute will not be invalidated if it is grounded on a reasonable justification, even if its classifications are not precise. See *McCrone*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, ¶ 8.

b. Rational relationship to a legitimate government purpose

**{¶ 67}** The limitations on noneconomic-damages awards in certain tort actions in R.C. 2315.18 certainly create distinctions between different groups of people. In setting a cap of either $250,000 or $350,000 on noneconomic damages for certain injuries and no caps on others, the statute treats those with lesser injuries, i.e., those not suffering the injuries designated in R.C. 2315.18(B)(3), differently from those most severely injured.

**{¶ 68}** The General Assembly's general justification for the tort reforms in S.B. 80 was that the state has an "interest in making certain that Ohio has a fair, predictable system of civil justice that preserves the rights of those who have been harmed by negligent behavior, while curbing the number of frivolous lawsuits, which increases the cost of doing business, threatens Ohio jobs, drives up costs to consumers, and may stifle innovation." S.B. 80, Section 3(A)(3), 150 Ohio Laws, Part V, 8024. As noted in the due-process discussion, the General Assembly reviewed several studies and other forms of evidence to reach this conclusion. Id. at 8024-8025, Section 3(A)(3)(a) through (f). In regard to noneconomic injuries, it noted that awards for such injuries are inherently subjective and susceptible to improper inflation. Id. at Section 3(A)(6)(a), (c), and (d). It also found that "[i]nflated damage awards create an improper resolution of civil justice claims." Id. at (e).

**{¶ 69}** After reviewing these findings, we conclude that R.C. 2315.18 is rationally related to the legitimate state interests of reforming the state civil justice system to make it fairer and more predictable and thereby improving the state's economy. One cannot deny that noneconomic-damages awards are inherently subjective and difficult to evaluate. The uncertainty associated with such damages logically leads to a lack of predictability as well as the occasional influence of irrelevant factors such as a defendant's improper actions. While such uncertainty and the specter of improper influences are serious concerns on their own, the General Assembly reviewed and cited evidence that these issues are having real, deleterious effects on state economies across the nation, including Ohio.

**{¶ 70}** The noneconomic-damages limits created in R.C. 2315.18 may or may not be the best way to address the perceived problems in the civil justice system. Arbino offered numerous challenges to the evidence, suggesting that it was overly focused on national issues, biased toward one side of the argument, and lacked the verifiability and credibility offered by peer review. We note these concerns and acknowledge that tort reform is a contentious issue across the country.

**{¶ 71}** However, the General Assembly is charged with making the difficult policy decisions on such issues and codifying them into law. This court is not the forum in which to second-guess such legislative choices; we must simply determine whether they comply with the Constitution. See *State ex rel. Ohio Congress of Parents & Teachers v. State Bd. of Edn.*, 111 Ohio St.3d 568, 2006-Ohio-5512, 857 N.E.2d 1148, ¶ 20.

**{¶ 72}** In that function, we cannot say that the General Assembly's action lacked all rational relation to the legitimate state interest of improving the state's civil justice system and its economy. The limitations were aimed at reducing the uncertainty associated with the existing tort system and the negative consequences

resulting from it. The distinctions the legislature drew in refusing to limit certain injuries were rational and based on the conclusion that catastrophic injuries offer more concrete evidence of noneconomic damages and thus calculation of those damages poses a lesser risk of being tainted by improper external considerations. That reasoning withstands scrutiny under the rational-basis test. Therefore, R.C. 2315.18 does not violate the right to equal protection under Section 2, Article I of the Ohio Constitution.

5. Separation of Powers

{¶ 73} Arbino's next challenge to R.C. 2315.18 is that it violates the separation of powers among the three branches of government, particularly between the legislative and judicial branches. Ohio's Constitution states: "The general assembly shall grant no divorce, nor exercise any judicial power, not herein expressly conferred." Section 32, Article II, Ohio Constitution. Arbino argues that the statute both "arrogates to the legislature the exclusively judicial power to decide damages for personal injuries" and represents an impermissible reenactment of legislation previously found unconstitutional. These claims are addressed in turn.

{¶ 74} The argument that R.C. 2315.18 infringes on the judicial power to decide damages lacks merit. It is certainly a judicial function to decide the facts in a civil case, and the amount of damages is a question of fact. *Huntington & Finke Co. v. Lake Erie Lumber Supply Co.* (1924), 109 Ohio St. 488, 502, 143 N.E. 132. However, that function is not so exclusive as to prohibit the General Assembly from regulating the amount of damages available in certain circumstances. As noted in Section III.A.1, there are numerous statutes trebling damages for various causes of action; under Arbino's logic, these statutes would also abrogate judicial authority. Section 32, Article II does not provide such strict limitations on the General Assembly's powers.

22

{¶ 75} Arbino's contention that the General Assembly reenacted legislation previously deemed unconstitutional also fails. Her argument is largely premised on *Sheward*. There, we found that the General Assembly's actions amounted to an attempt "to establish itself as the final arbiter of the validity of its own legislation." *Sheward*, 86 Ohio St.3d at 492, 715 N.E.2d 1062.

{¶ 76} To conclude in this case as the majority concluded in *Sheward* would require us to determine that the General Assembly passed statutory provisions so similar to those previously deemed unconstitutional that its actions could only be interpreted as an invasion of the solely judicial right to interpret the Constitution. See id. at 493–494, 715 N.E.2d 1062. As noted above, R.C. 2315.18 is sufficiently different from the previous noneconomic-damages caps to warrant both a fresh review of its merits and approval of its validity. The General Assembly obviously does not violate the separation of powers by looking to this court's interpretation of the Constitution for guidance in creating constitutional legislation. Therefore, R.C. 2315.18 does not violate Section 32, Article II of the Ohio Constitution.

6. Single-Subject Rule

{¶ 77} Finally, Arbino challenges R.C. 2315.18 under the single-subject rule in Section 15(D), Article II, which states that "[n]o bill shall contain more than one subject, which shall be clearly expressed in its title."

{¶ 78} This provision exists to prevent the General Assembly from engaging in "logrolling." *State ex rel. Dix v. Celeste* (1984), 11 Ohio St.3d 141, 142, 11 OBR 436, 464 N.E.2d 153. This practice occurs when legislators combine a disharmonious group of proposals in a single bill so that they may consolidate votes and pass provisions that may not have been acceptable to a majority on their own merits. See id. at 142–143, 11 OBR 436, 464 N.E.2d 153. "The one-subject provision attacks logrolling by disallowing unnatural combinations of provisions in acts, *i.e.*, those dealing with more than one subject,

on the theory that the best explanation for the unnatural combination is a tactical one – logrolling." Id. at 143, 11 OBR 436, 464 N.E.2d 153. Arbino argues that S.B. 80 violates this provision by combining a variety of vastly different subjects under one title, lumping such subjects as Board of Cosmetology membership (R.C. 4713.02) and practice protocols for retired dentists (R.C. 4715.42) with the tort reforms discussed herein.

{¶ 79} However, unlike in *Sheward*, where we were asked to examine H.B. 350 in its entirety, the review here is limited to three specific statutes within S.B. 80. Because the entire enactment was not made an issue in this case, we cannot determine whether it violates the single-subject rule as a whole, and therefore decline to rule on this issue.

7. Constitutionality of R.C. 2315.18

{¶ 80} R.C. 2315.18 does not violate the right to a trial by jury, the right to a remedy, the right to an open court, the right to due process of law, the right to equal protection of the laws, or the separation of powers, and is therefore constitutional on its face.

B. Admissibility of Collateral-Benefit Evidence in R.C. 2315.20

{¶ 81} The second certified question concerns the constitutionality of R.C. 2315.20. This statute modifies the collateral-source rule, which has been defined as " 'the judicial refusal to credit to the benefit of the wrongdoer money or services received in reparation of the injury caused which emanates from sources other than the wrongdoer.' " *Pryor v. Webber* (1970), 23 Ohio St.2d 104, 107, 52 O.O.2d 395, 263 N.E.2d 235, quoting Maxwell, The Collateral Source Rule in the American Law of Damages (1962), 46 Minn.L.Rev. 669, 670.

{¶ 82} R.C. 2315.20 modifies this rule by allowing the defendant in a tort action to introduce evidence of amounts payable to the plaintiff as a result of the injuries suffered unless "the source of collateral benefits has a mandatory self-effectuating right of subrogation or" a contractual or statutory right of subrogation

24

or the benefits were from a life insurance or disability plan.  R.C. 2315.20(A). Life insurance or disability payments may still be introduced into evidence if the policies were paid for by the plaintiff's employer and the employer is the defendant.  Id.  If a defendant chooses to introduce such evidence, R.C. 2315.20 allows the plaintiff to introduce evidence of the amounts paid to secure the right to receive the benefits.  Id. at (B).

{¶ 83} After initially challenging the constitutionality of this statute in her motion for partial summary judgment, Arbino realized through discovery that her insurance contract contains a subrogation clause.  Given this information, she has conceded that she lacks standing to challenge the statute, but nevertheless asks us to deem it invalid.

{¶ 84} Since R.C. 2315.20 does not apply to Arbino, we are bound not to consider her challenge to it.  Every court must "refrain from giving opinions on abstract propositions and * * * avoid the imposition by judgment of premature declarations or advice upon potential controversies."  *Fortner v. Thomas* (1970), 22 Ohio St.2d 13, 14, 51 O.O.2d 35, 257 N.E.2d 371.  It is well-settled law that this court will not issue such advisory opinions.  See *Egan v. Natl. Distillers & Chem. Corp.* (1986), 25 Ohio St.3d 176, 25 OBR 243, 495 N.E.2d 904, syllabus. We therefore decline to answer the second certified question.

C.  Punitive-Damages Limits in R.C. 2315.21

{¶ 85} The third certified question concerns the constitutionality of R.C. 2315.21, which limits the recovery of punitive damages in certain tort actions.[5] The S.B. 80 amendments to this section included a procedure for bifurcation of

5. For the purposes of R.C. 2315.21, "'[t]ort action' means a civil action for damages for injury or loss to person or property," and includes products-liability actions but not actions for breach of contract or other agreement.  R.C. 2315.21(A)(1).  However, it does not apply to tort actions against the state in the Court of Claims (including actions against a state university or college as detailed in R.C. 3345.40(B)(1)) or to actions against political subdivisions that are commenced under R.C. Chapter 2744.  Id. at (E).  It also does not apply if another section of the Revised Code meets one of the exceptions set forth in R.C. 2315.21(E)(1) through (4).

proceedings for compensatory and punitive damages and a limitation on the amount of punitive damages recoverable in tort actions. R.C. 2315.21(B) and (D). Arbino has not challenged the bifurcation process, instead focusing her attack on the punitive-damages limitations.

{¶ 86} The statute limits punitive damages in tort actions to a maximum of two times the total amount of compensatory damages awarded to a plaintiff per defendant. Id. at (D)(2)(a). However, these limitations do not apply if the defendant committed a felony in causing the injury, one of the elements of the felony is that is was committed purposely or knowingly, and the defendant was convicted of or pleaded guilty to the felony. Id. at (D)(6).

{¶ 87} If the limitations do apply, punitive damages may be limited further if the defendant is a "small employer"[6] or an individual. R.C. 2315.21(D)(2)(b). In that case, the punitive damages may not exceed "the lesser of two times the amount of the compensatory damages awarded to the plaintiff from the defendant or ten percent of the employer's or individual's net worth when the tort was committed, up to a maximum of three hundred fifty thousand dollars." Id.

{¶ 88} Additionally, punitive damages may not be awarded more than once against the same defendant for the same act or course of conduct once the maximum amount of damages has been reached. R.C. 2315.21(D)(5)(a). However, this restriction can be overcome if the plaintiff offers new and substantial evidence of previously undiscovered behaviors for which punitive damages are appropriate or the prior awards against the defendant were "totally insufficient" to punish the defendant. Id. at (D)(5)(b)(i) and (ii).

---

6. "Small employer" is defined as an entity with not more than 100 full-time permanent employees or, if the company qualifies as a manufacturer, with not more than 500 full-time permanent employees. R.C. 2315.21(A)(5).

**{¶ 89}** Arbino presents the same constitutional challenges to this statute that she raised against R.C. 2315.18. Her arguments are addressed in turn.

1. Right to a Trial by Jury

**{¶ 90}** Arbino's first challenge to this statute is that it violates the right to a trial by jury under Section 5, Article I of the Ohio Constitution. As explained in Section III.A.1, the fact that a statute limits potential damages as a matter of law does not mean that it violates the right to a jury trial. Therefore, Arbino's challenge to R.C. 2315.21 can succeed only if the statute actually intrudes upon the jury's fact-finding function.

**{¶ 91}** To make her case, Arbino cites our decisions in *Zoppo* and *Sheward.* She cites *Zoppo*, 71 Ohio St.3d at 557, 644 N.E.2d 397, for the proposition that "Ohio courts have consistently understood that all damages, without distinction as to type, are for the jury to determine as part of the jury trial right."

**{¶ 92}** However, *Zoppo* examined a statute that required trial courts to determine the amount of punitive damages to be awarded, even if the jury was the trier of fact. *Zoppo,* 71 Ohio St.3d at 556, 644 N.E.2d 397, quoting former R.C. 2315.21(C)(2). We struck that statute as unconstitutional because it wholly removed the jury from the fact-finding process: "[B]y permitting only the court to determine the amount of punitive damages, [the General Assembly] has in effect abrogated the common-law right of the jury to assess the amount of punitive damages." Id., 71 Ohio St.3d at 557, 644 N.E.2d 397. R.C. 2315.21 does not have this effect; it still permits the trier of fact to determine punitive damages. The subsequent application of a statute to this decision does not abrogate the established function of the jury.

**{¶ 93}** Arbino's *Sheward* argument similarly fails. Although the majority discussed its view that a similar limit on punitive damages would unconstitutionally infringe on the jury's fact-finding function, it did so in dicta

27

before striking H.B. 350 as unconstitutional in toto. See 86 Ohio St.3d at 483–485, 715 N.E.2d 1062; id. at paragraphs two and three of the syllabus. We are therefore not required to follow that view as precedent. See *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶85 (Sweeney, J., dissenting), quoting Black's Law Dictionary (6th Ed.1990) 454.

{¶ 94} However, even if we were bound by that reasoning, we would be compelled to revisit it. Since *Sheward* was decided, the United States Supreme Court has clarified the authority of state legislatures in setting punitive damages. "As in the criminal sentencing context, legislatures enjoy broad discretion in authorizing and limiting permissible punitive damages awards." *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001), 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674, citing *BMW of N. Am., Inc. v. Gore* (1996), 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 ("States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case").

{¶ 95} This post-*Sheward* precedent conclusively establishes that regulation of punitive damages is discretionary and that states may regulate and limit them as a matter of law without violating the right to a trial by jury. R.C. 2315.21 represents the General Assembly's exercise of its powers in this regard, and thus does not violate Section 5, Article I of the Ohio Constitution.

2. Right to a Remedy and Right to an Open Court

{¶ 96} Arbino also argues that R.C. 2315.21 violates the right to a remedy in an open court. This right protects against laws that completely foreclose a cause of action for injured plaintiffs or otherwise eliminate the ability to receive a meaningful remedy. See *Brennaman*, 70 Ohio St.3d at 466, 639 N.E.2d 425; *Sorrell*, 69 Ohio St.3d at 426, 633 N.E.2d 504.

{¶ 97} Like the noneconomic-damages limits in R.C. 2315.18, the punitive-damages limits in R.C. 2315.21 do not deny plaintiffs the right to seek a

remedy for their tort claims. Further, they do not eliminate the ability to seek a "meaningful" remedy for their injuries, primarily because punitive damages "are not compensation for injury. Instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Gertz v. Robert Welch, Inc.* (1974), 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789. "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331.

{¶ 98} Because punitive damages are separate and apart from any remedy for a plaintiff's injuries, and because R.C. 2315.21 does not prevent potential plaintiffs from bringing a successful cause of action for their injuries, it does not violate Section 16, Article I of the Ohio Constitution.

3. Due Course of Law/Due Process

{¶ 99} Arbino also alleges that R.C. 2315.21 violates the "due course of law" provision in Section 16, Article I of the Ohio Constitution. For the same reasons expressed in Section III.A.3, we will use the rational-basis test for this challenge. *Morris*, 61 Ohio St.3d at 688–689, 576 N.E.2d 765.

a. Real and substantial relation to the general welfare of the public

{¶ 100} R.C. 2315.21 does not offend due process under this test. The General Assembly cited several studies and other forms of evidence upon which it relied in concluding that the civil justice system as it then existed was harming the state's economy. S.B. 80, Section 3(A)(1) through (3), 150 Ohio Laws, Part V, 8024. It then reviewed punitive damages in view of this evidence and concluded that such awards were part of the problem. Section 3(A)(4)(a) and (b). The General Assembly noted that while punitive damages serve the purpose of punishing tortfeasors for certain wrongful actions and omissions, the "absence of a statutory ceiling upon recoverable punitive or exemplary damages in tort actions has resulted in occasional multiple awards * * * that have no rational connection

to the wrongful actions or omissions of the tortfeasor." Section 3(A)(4)(b)(ii). The uncodified section further explained the basis for limitations on awards against small employers[7] and stated that the ratio used for the limitation derived from recent United States Supreme Court precedent. Section 3(A)(4)(b) and (c), 150 Ohio Laws, Part V, 8025.

{¶ 101} As noted in Section III.A.3, we accept that the evidence cited sufficiently demonstrated the need to reform the civil litigation system in the state. Using this evidence, the General Assembly found that the uncertainty and subjectivity associated with the civil justice system was harming the state's economy. The reforms codified in R.C. 2315.21 were an attempt to limit the subjective process of punitive-damages calculation, something the General Assembly believed was contributing to the uncertainty.

{¶ 102} Arbino assails these findings, arguing that the General Assembly relied on "generalizations about the dilemma of punitive damages, without citation to any specific testimony or evidence supporting its claims." While we agree with Arbino that the legislative record is thin in this regard, it nonetheless offers justifications sufficient to meet the requirement of a "real and substantial relation" to the general welfare of the public. The general goal of making the civil justice system more predictable is logically served by placing limits that ensure that punitive damages generally cannot exceed a certain dollar figure. Based on its review of the economic evidence, the General Assembly believes that such predictability will aid the state economy. That reasoning is sufficient under the first prong of the analysis.

b. Neither arbitrary nor unreasonable

---

7. In this regard, Section 3(A)(4)(b)(iii) of S.B. 80 stated that the limits were based on the economic capacity to maintain certain numbers of employees and the impact on the community at large, as set forth in the North American Industry Classification System and the United States Small Business Administration's Office of Advocacy. 150 Ohio Laws, Part V, 8026.

**{¶ 103}** Under the second prong, we find that the statute is neither arbitrary nor unreasonable. Setting the limitation at double the amount of compensatory damages received by the plaintiff ensures that the defendant may still be punished. Further, the exceptions for small employers and individuals strike a balance between imposing punishment and ensuring that lives and businesses are not destroyed in the process. This careful compromise represents a level of thought and attention to detail not seen in arbitrary or unreasonable statutes.

**{¶ 104}** For the foregoing reasons, R.C. 2315.21 does not offend the due-process protections in Section 16, Article I of the Ohio Constitution.

4. Equal Protection

**{¶ 105}** Arbino also challenges R.C. 2315.21 on equal-protection grounds. Similar to the noneconomic-damages limits discussed in Section III.A.4, this enactment neither infringes on fundamental rights nor discriminates against suspect classes. Therefore, we review it under the rational-basis standard, upholding it if it is rationally related to a legitimate government purpose. See *Williams*, 88 Ohio St.3d at 530, 728 N.E.2d 342.

**{¶ 106}** For the same reasons discussed in Section III.A.4, R.C. 2315.21 is rationally related to the legitimate state interest of improving the state's civil justice system and its economy. The limitations imposed on the inherently subjective process of calculating punitive damages were rational responses to the negative effects associated with the uncertainty of the civil litigation system. Although Arbino suggests that different methods could have been used, we will not consider them in the face of a constitutional statute. Because we find that the rational-basis test is satisfied, R.C. 2315.21 is permissible under Section 2, Article I of the Ohio Constitution.

5. Separation of Powers

**{¶ 107}** Arbino's next challenge to R.C. 2315.21 falls under the separation of powers in Section 32, Article II of the Ohio Constitution. She generally alleges that the statute unconstitutionally seizes the judicial power to determine damages and that the General Assembly reenacted legislation previously deemed unconstitutional. As noted in Section III.A.5, statutory damages limits do not intrude on the judicial power to determine damages. The same reasoning applies here.

**{¶ 108}** The argument that the General Assembly simply reenacted a statute previously deemed unconstitutional similarly lacks merit. R.C. 2315.21 is admittedly similar to the punitive-damages statute struck down in *Sheward*. See *Sheward*, 86 Ohio St.3d at 483-484, 715 N.E.2d 1062. However, while the majority opinion discussed a potential conflict with the right to a trial by jury in *Sheward*, it did not invalidate the statute on those grounds, holding instead that H.B. 350 violated the separation of powers and the single-subject rule in toto. Id. at paragraphs two and three of the syllabus.

**{¶ 109}** While the General Assembly reenacted a statute deemed unconstitutional in a prior decision by this court, it did so in a way that alleviated the constitutional concerns advanced therein. Therefore, R.C. 2315.21 does not violate Section 32, Article II of the Ohio Constitution.

6. Single-Subject Rule

**{¶ 110}** Arbino's final attack on R.C. 2315.21 invokes the single-subject rule in Section 15(D), Article II of the Ohio Constitution. However, as noted in Section III.A.6, Arbino did not challenge S.B. 80 in its entirety, and thus we decline to rule on this challenge.

7. Constitutionality of R.C. 2315.21

**{¶ 111}** R.C. 2315.21 does not violate the right to a trial by jury, the right to a remedy, the right to an open court, the right to due process of law, the right to

equal protection of the laws, or the separation of powers, and is therefore constitutional on its face.

## IV. Conclusion

**{¶ 112}** The decision in this case affirms the General Assembly's efforts over the last several decades to enact meaningful tort reforms. It also places Ohio firmly with the growing number of states that have found such reforms to be constitutional.[8] However, the issue remains a contentious one across the nation, with several states finding such statutes unconstitutional.[9]

---

8. {¶a} As of the date of this opinion, courts have upheld limits on noneconomic damages in at least 19 other jurisdictions: Alaska (*Evans v. Alaska* (Alaska 2002), 56 P.3d 1046); California (*Fein v. Permanente Med. Group* (1985), 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665); Colorado (*Garhart v. Colombia/HealthONE, L.L.C.* (Colo.2004), 95 P.3d 571); Florida (*Mizrahi v. Miami Med. Ctr., Ltd.* (Fla.2000), 761 So.2d 1040); Idaho (*Kirkland v. Blaine Cty. Med. Ctr.* (2000), 134 Idaho 464, 4 P.3d 1115); Indiana (*Johnson v. St. Vincent Hosp., Inc.* (1980), 273 Ind. 374, 404 N.E.2d 585); Kansas (*Samsel v. Wheeler Transp. Servs., Inc.* (1990), 246 Kan. 336, 789 P.2d 541, overruled on other grounds in *Bair v. Peck* (1991), 248 Kan. 824, 811 P.2d 1176); Maine (*Peters v. Saft* (Me.1991), 597 A.2d 50); Maryland (*Murphy v. Edmonds* (1992), 325 Md. 342, 601 A.2d 102); Missouri (*Adams v. Children's Mercy Hosp.* (Mo.1992), 832 S.W.2d 898); Montana (*Meech v. Hillhaven W., Inc.* (1989), 238 Mont. 21, 776 P.2d 488); Nebraska (*Gourley v. Nebraksa Methodist Health Sys., Inc.* (2003), 265 Neb. 918, 663 N.W.2d 43 [$1.25 million cap on all damages]); New Mexico (*Fed. Express Corp. v. United States* (D.N.M.2002), 228 F.Supp.2d 1267); Oregon (*Greist v. Phillips* (1995), 322 Ore. 281, 906 P.2d 789); South Carolina (*Wright v. Colleton Cty. School Dist.* (1990), 301 S.C. 282, 391 S.E.2d 564); Texas (*Rose v. Doctors Hosp.* (Tex.1990), 801 S.W.2d 841 [cap on all damages]); Utah (*Judd v. Drezga*, 2004 UT 91, 103 P.3d 135); Virginia (*Pulliam v. Coastal Emergency Servs. of Richmond, Inc.* (1999), 257 Va. 1, 509 S.E.2d 307 [cap on all damages]); and West Virginia (*Robinson v. Charleston Area Med. Ctr., Inc.* (1991), 186 W.Va. 720, 414 S.E.2d 877).

{¶ b}At least ten states have upheld limitations on punitive damages, including provisions requiring that a certain percentage of awards be allotted to a designated public fund: Alaska (*Reust v. Alaska Petroleum Contrs., Inc.* (Alaska 2005), 127 P.3d 807); Florida (*Gordon v. Florida* (Fla.1992), 608 So.2d 800); Georgia (*Mack Trucks, Inc. v. Conkle* (1993), 263 Ga. 539, 436 S.E.2d 635); Indiana (*Cheatham v. Pohle* (Ind.2003), 789 N.E.2d 467); Iowa (*Shepherd Components, Inc. v. Brice Petrides-Donohue & Assoc., Inc.* (Iowa 1991), 473 N.W.2d 612); Kansas (*Smith v. Printup* (1993), 254 Kan. 315, 866 P.2d 985 [upholding requirement that courts, not juries, calculate punitive awards]); Missouri (*Fust v. Missouri Atty. Gen.* (Mo.1997), 947 S.W.2d 424); Montana (*Meech v. Hillhaven W., Inc.* (1989), 238 Mont. 21, 776 P.2d 488); North Carolina (*Rhyne v. K-Mart Corp.* (2004), 358 N.C. 160, 594 S.E.2d 1); and Oregon (*DeMendoza v. Huffman* (2002), 334 Ore.425, 51 P.3d 1232).

9. Among those finding such attempts at reform unconstitutional are Illinois (*Best v. Taylor Machine Works* (1997), 179 Ill.2d 367, 689 N.E.2d 1057 [striking down caps on noneconomic damages]); New Hampshire (*Brannigan v. Usitalo* (1991), 134 N.H. 50, 587 A.2d 1232 [same]);

{¶ 113} We appreciate the policy concerns Arbino and her amici have raised. However, the General Assembly is responsible for weighing those concerns and making policy decisions; we are charged with evaluating the constitutionality of their choices. Issues such as the wisdom of damages limitations and whether the specific dollar amounts available under them best serve the public interest are not for us to decide. Using a *highly deferential* standard of review appropriate to a *facial challenge* to these statutes, we conclude that the General Assembly has responded to our previous decisions and has created constitutionally permissible limitations.

{¶ 114} Thus, we answer the first and third certified questions in the negative, finding R.C. 2315.18 and R.C. 2315.21 to be constitutional on their face. We decline to answer the second certified question on the constitutionality of R.C. 2315.20 for lack of standing.

LUNDBERG STRATTON, O'CONNOR, and LANZINGER, JJ., concur.

CUPP, J., concurs separately.

O'DONNELL, J., dissents in part.

PFEIFER, J., dissents.

_____

**CUPP, J., concurring.**

{¶ 115} I am in agreement with the majority opinion. However, I believe the question of whether the statutory limitation on noneconomic tort damages contravenes the right to a trial by jury under the Ohio Constitution deserves some additional consideration.

{¶ 116} There is no disagreement that the right to a trial by jury is a fundamental aspect of our jurisprudence and a cherished right. See, e.g., *Butler v.*

North Dakota (*Arneson v. Olson* (N.D.1978), 270 N.W.2d 125 [striking down cap on all damages]); South Dakota (*Knowles v. United States*, 1996 SD 10, 544 N.W.2d 183 [same]); and Wisconsin (*Ferdon v. Wisconsin Patients Comp. Fund*, 2005 WI 125, 284 Wis.2d 573, 701 N.W.2d 440 [striking down cap on noneconomic damages]).

*Jordan* (2001), 92 Ohio St.3d 354, 370-371, 750 N.E.2d 554. This long-held right derives from the Magna Carta and was applied, before Ohio became a state, to the Northwest Territory: "No man shall be deprived of his liberty or property, but by the judgment of his peers, or the law of the land * * *." Article 2, Northwest Ordinance of July 13, 1787. A component of that fundamental right is that juries are responsible for determining all factual issues, including compensatory damages. *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 422, 633 N.E.2d 504.

{¶ 117} Similarly, there is no disagreement that there are some limits to the right to trial by jury. The right to a trial by jury is guaranteed only for those causes to which the right attached at common law when the Ohio Constitution was adopted in 1802. *Belding v. State ex rel. Heifner* (1929), 121 Ohio St. 393, 169 N.E. 301, paragraph one of the syllabus. Negligence and intentional-tort actions, for example, fall within the trial-by-jury guarantee of Section 5, Article I, whereas will-contest and divorce actions do not. *Arrington v. DaimlerChrysler Corp.*, 109 Ohio St.3d 539, 2006-Ohio-3257, 849 N.E.2d 1004, ¶24; *State ex rel. Kear v. Lucas Cty. Court of Common Pleas* (1981), 67 Ohio St.2d 189, 21 O.O.3d 118, 423 N.E.2d 427 (will-contest actions); *Koepke v. Koepke* (1989), 52 Ohio App.3d 47, 48, 556 N.E.2d 1198 (divorce).

{¶ 118} None of this, however, addresses the right-to-jury issue presented in this case: Is the scope of the right to trial by jury so extensive as to preclude the law-making branch of constitutional government from altering or limiting the amount of damages available to a party prevailing in a common-law cause of action?

{¶ 119} An analysis of this issue must begin with the reason civil juries were considered important in our nation's early history. At the time the written constitutions were adopted, a primary purpose of the trial by jury was to safeguard the rights of individual citizens, not against legislative overreaching, but from judicial bias and judicial reexamination of jury-determined facts.

{¶ 120} The concern of biased and corrupt judges was expressed as early as colonial days. This fear arose from the colonists' concern that the English lawyers appointed by the king to preside over colonial courts would have a greater allegiance to imperial rule than to impartial justice. Robert L. Jones, Finishing a Friendly Argument: The Jury and the Historical Origins of Diversity Jurisdiction (2007), 82 N.Y.U.L.Rev. 997, 1028-1030. The trial by jury was perceived as a means to ensure the administration of impartial justice free from imperial interference.

{¶ 121} The writings of Alexander Hamilton and Thomas Jefferson also reflect the perception that judges in the 18th century had a partisan bias. In the Federalist Papers, for example, Alexander Hamilton, defending against opposition to the proposed federal Constitution because of its lack of a guarantee of civil jury trial, notes the virtue of the right to a trial by jury:

{¶ 122} "The excellence of the trial by jury in civil cases appears to depend on circumstances foreign to the preservation of liberty. The strongest argument in its favor is, that it is a security against corruption. As there is always more time and better opportunity to tamper with a standing body of magistrates than with a jury summoned for the occasion, there is room to suppose that a corrupt influence would more easily find its way to the former than to the latter." The Federalist No. 83 (Luce Ed.1976) at 544.

{¶ 123} Thomas Jefferson echoed Hamilton's sentiments, commenting that "permanent judges acquire an Esprit de corps, that being known they are liable to be tempted by bribery, that they are misled by favor, by relationship, by a spirit of party, by a devotion to the Executive or Legislative; * * * and that the opinion of 12 honest jurymen gives still a better hope of right." Letter of July 19, 1789 from Thomas Jefferson to the Abbe Arnoux (reprinted in 5 Kurland & Lerner, The Founders' Constitution (1986) 364). See also *Parklane Hosiery Co., Inc. v. Shore* (1979), 439 U.S. 322, 343, 99 S.Ct. 645, 58 L.Ed.2d 552 (Rehnquist,

J., dissenting) (the right to a jury trial is an "important bulwark against tyranny and corruption, a safeguard too precious to be left to the whim of the sovereign, or, it might be added, to that of the judiciary").

{¶ 124} And the concern of judicial overreaching was not unfounded. As noted by United States Supreme Court Justice Black in his dissent in *Cohen v. Hurley* (1961), 366 U.S. 117, 139, 81 S.Ct. 954, 6 L.Ed.2d 156, the English judiciary had a propensity "to make 'short shrift' of" jurors, subjecting them to beratement, fines, and indefinite imprisonment in the event of a "wrong verdict." These abuses were among those that "led, first, to the colonization of this country, later, to the war that won its independence, and, finally, to the Bill of Rights." Id. at 140, 81 S.Ct. 954, 6 L.Ed.2d 156.

{¶ 125} Finally, Ohio constitutional history also reflects that the right to a trial by jury was in response to a concern regarding a biased judiciary. During the debates at the 1850 Ohio Constitutional Convention, A. Harlan, a delegate from Greene County, read from a petition from Richard Randolph. In the petition, Randolph traced juries to the Saxon age, "when they formed an integral part of the Sheriff's county court." But the jury evolved into "a happy and patriotic adaptation to elude the force of oppression, by the decrees of venal and subservient judges," and was at the time the "only means then devised to resist tyranny and the tools of tyrants; - and it thus became rather the palladium of their civil rights than the best form of judicature." 2 Reports of the Debates and Proceedings of the Convention for the Revision of the Constitution of the State of Ohio, 1850-1851 (1851) 191.

{¶ 126} Consequently, the right to trial by jury was regarded as a legal mechanism to protect the rights of individual citizens from an overreaching judiciary. Admittedly, relying on historical information to interpret a contemporary constitutional question is not without difficulty. William E. Nelson, History and Neutrality in Constitutional Adjudication (1986), 72

Va.L.Rev. 1237, 1282. Nonetheless, the foregoing discussion indicates that the right to a trial by jury was intended to guard against judicial bias rather than as a limit on the ability of the legislature to act within its constitutional boundaries.

{¶ 127} Although the right to trial by jury is of great constitutional significance, this state's Constitution also provides that all legislative power of the state is vested in, and solely exercised by, the General Assembly. Section 1, Article II, Ohio Constitution; *State ex rel. Bryant v. Akron Metro. Park Dist. for Summit Cty.* (1929), 120 Ohio St. 464, 473, 166 N.E. 407. Statutes crafted by the General Assembly establish the laws and public policies of the state. *Chambers v. St. Mary's School* (1998), 82 Ohio St.3d 563, 566, 697 N.E.2d 198 (General Assembly determines public policy); *Akron Metro. Park Dist. for Summit Cty.*, 120 Ohio St. at 479, 166 N.E. 407 (same).

{¶ 128} The constitutional grant of authority at Section 1, Article II vests in the General Assembly the plenary power to enact any law except those that conflict with the Ohio or United States constitutions. *State ex rel. Jackman v. Cuyahoga Cty. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 162, 38 O.O.2d 404, 224 N.E.2d 906. The General Assembly may make amendments, or create exceptions, to previously enacted legislation, such as forbidding things previously permitted, and it may modify or entirely abolish common-law actions. *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 214, 527 N.E.2d 1235; *Thompson v. Ford* (1955), 164 Ohio St. 74, 79, 57 O.O. 96, 128 N.E.2d 111; *Pohl v. State* (1921), 102 Ohio St. 474, 476, 132 N.E. 20, reversed on other grounds by *Bartels v. Iowa* (1923) 262 U.S. 404, 43 S.Ct. 628, 67 L.Ed. 1047); *Washington Cty. Dept. of Human Servs. v. Rutter* (1995), 100 Ohio App.3d 32, 35, 651 N.E.2d 1360. Such legislative action is constitutionally permitted because, although "[r]ights of property cannot be taken away or interfered with without due process of law * * *[,] there is no property or vested right in any of the rules of the common law, as guides of conduct, and they may be added to or repealed by legislative authority."

*Leis v. Cleveland Ry. Co.* (1920), 101 Ohio St. 162, 128 N.E. 73, paragraph one of the syllabus.

{¶ 129} The United States Supreme Court has determined that the alteration of the common law is not proscribed by the federal Constitution either:

{¶ 130} "A person has no property, no vested interest, in any rule of the common law. * * * Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will, or even at the whim, of the legislature, unless prohibited by constitutional limitations." *Munn v. Illinois* (1876), 94 U.S. 113, 134, 24 L.Ed. 77.

{¶ 131} In summary, it is long-settled constitutional law that it is within the power of the legislature to alter, revise, modify, or abolish the common law as it may determine necessary or advisable for the common good.

{¶ 132} The power to alter or abolish a common-law cause of action necessarily includes the power to modify any associated remedy. See, e.g., *State v. Barlow* (1904), 70 Ohio St. 363, 374-375, 71 N.E. 726 (remedies may be altered legislatively); *Stine v. Atkinson* (1942), 69 Ohio App. 529, 533, 24 O.O. 264, 44 N.E.2d 372 (the elements to a cause of action include a remedy). See also *Pacific Mut. Life Ins. Co. v. Haslip* (1991), 499 U.S. 1, 39, 111 S.Ct. 1032, 113 L.Ed.2d 1 (Scalia, J., concurring in judgment) (the legislature has the authority to restrict or abolish the common-law practice of punitive damages). Indeed, it would be illogical that, while the right to trial by jury does not prevent the legislature from altering or abolishing a cause of action, it nevertheless prevents the legislature from defining by statute the remedies available for a cause of action.

{¶ 133} Still, the dissent echoes the plaintiff's assertion that the amount of damages recoverable under a common-law cause of action cannot be limited by action of the legislature because determining the amount of damages is reserved

to the jury by the constitutional right to trial by jury. However, we are provided no historical analysis to support this contention, nor are we directed to any relevant case precedent with that analysis.[10] Nor have I found any. The historical information that is available does not support the contention that the right to a trial by jury acts as a limit to constitutionally exercised legislative action.

{¶ 134} The absence of any analysis and precedent rationally leads to the conclusion that the legislature's law-making power is not so limited, provided the litigant retains the right to have the jury determine the amount of damages to the extent the damages are legally available. Legislative action, however, may alter or limit what damages the law makes available and legally recoverable. In doing so, the General Assembly does not trespass upon the right to jury trial.

{¶ 135} Federal courts, interpreting the United States Constitution, have also concluded that a legislature's constitutional authority to create, alter, or abolish law includes the ability to alter or limit the kind and amount of damages available to a prevailing party, without running afoul of the right to a jury trial protected by the Seventh Amendment to the United States Constitution. *Davis v. Omitowoju* (C.A.3, 1989), 883 F.2d 1155, 1159-1165 (medical malpractice); *Boyd v. Bulala* (C.A.4, 1989), 877 F.2d 1191, 1196 (medical malpractice); *Franklin v. Mazda Motor Corp.* (D.Md.1989), 704 F.Supp. 1325, 1330-1334 (pain and suffering).[11] Admittedly, federal decisions interpreting state damages limitations under the Seventh Amendment are not controlling on this court. The Seventh

---

10. Prior Ohio cases from which this assertion is partially drawn provide no analysis, historical or otherwise, to validate the assertion. From this I am forced to conclude that the idea that the Constitution's right to jury trial somehow proscribes the General Assembly from altering remedies for a common-law cause of action is of recent, not historical, origin.

11. The United States Supreme Court has not specifically addressed the issue of whether state statutory damages limitations are valid. It has, however, acknowledged the *Davis* and *Boyd* dispositions upholding the constitutionality of the postverdict application of state statutory limitations in diversity cases. *Gasperini v. Ctr. for Humanities, Inc.* (1996), 518 U.S. 415, 429, 116 S.Ct. 2211, 135 L.Ed.2d 659, fn. 9.

Amendment does not apply to the states. *Gasperini v. Ctr. for Humanities, Inc.* (1996), 518 U.S. 415, 432, 116 S.Ct. 2211, 135 L.Ed.2d 659. But such decisions are strongly persuasive.

{¶ 136} In light of the General Assembly's constitutionally granted, plenary legislative power; the lack of a vested right to the rules of the common law; the long-settled law that the General Assembly's power extends to the alteration or abolition of common-law causes of actions, including those to which the right of a trial by jury attaches; the complete lack of historical support or reasoned precedent cited by the plaintiff and the dissents; and the strong presumption in favor of the constitutionality of legislative enactment, I conclude that the Constitution and the right to trial by jury do not implicate the General Assembly's plenary, constitutional law-making power to define what damages are available in a common-law cause of action, including reasonable limitations on such damages.

{¶ 137} Some may think limitations on certain damages to be unwise legislative policy-making, but it is beyond the authority of any court to write into the Constitution that which was not installed there by the framers and ratified by the people. I conclude, therefore, that the noneconomic-damages limitations of R.C. 2315.18 do not violate the right to trial by jury of Section 5, Article I of the Ohio Constitution.

LUNDBERG STRATTON, O'CONNOR, and LANZINGER, JJ., concur in the foregoing opinion.

_____

**O'DONNELL, J., dissenting in part.**

{¶ 138} Section 5, Article I of the Ohio Constitution states that "[t]he right of trial by jury *shall be inviolate*, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury." (Emphasis added.)

**{¶ 139}** In *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 633 N.E.2d 504, we reiterated that " '[t]he right to a jury trial does not involve merely a question of procedure. The right to jury trial derives from Magna Charta. It is reasserted both in the Constitution of the United States and in the Constitution of the State of Ohio. For centuries it has been held that the right of trial by jury is a fundamental constitutional right, a substantial right, and not a procedural privilege.' " Id. at 421, 633 N.E.2d 504, quoting *Cleveland Ry. Co. v. Halliday* (1933), 127 Ohio St. 278, 284, 188 N.E. 1, and citing *Kneisley v. Lattimer-Stevens Co.* (1988), 40 Ohio St.3d 354, 356, 533 N.E.2d 743. In *Sorrell*, we further stated that this constitutional right includes the "right to have all facts determined by the jury, including damages." Id. at 422, 633 N.E.2d 504, citing *Miller v. Wikel Mfg. Co.* (1989), 46 Ohio St.3d 76, 81, 545 N.E.2d 76 (Douglas, J., concurring in part and dissenting in part).

**{¶ 140}** The majority acknowledges *Sorrell*, stating that "[b]ecause the extent of damages suffered by a plaintiff is a factual issue, it is within the jury's province to determine the amount of damages to be awarded," but it concludes that the cap on noneconomic damages established by R.C. 2315.18 does not violate this constitutional right because "[c]ourts must simply apply the limits as a matter of law to the facts found by the jury; they do not alter the findings of facts themselves, thus avoiding constitutional conflicts." In support, the majority relies on two other instances where a court may modify a jury's findings with respect to damages: one, remittitur, and two, statutory treble damages. Further, the majority relies on federal precedent holding that the Seventh Amendment to the United States Constitution does not forbid the application of caps on damages. In my view, all three bases for the majority's holding are inapposite.

**{¶ 141}** In *Alter v. Shearwood* (1926), 114 Ohio St. 560, 151 N.E. 667, this court held that the doctrine of remittitur is constitutional. But a remittitur, in my opinion, differs fundamentally from the cap on noneconomic damages

42

imposed by R.C. 2315.18. In *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 444, 715 N.E.2d 546, we stated that "[a] court has the inherent authority to remit an excessive award, assuming it is not tainted with passion or prejudice, to an amount supported by the weight of the evidence," explaining that "specific criteria * * * must be met before a court may grant a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages." Id., citing *Chester Park v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus.

{¶ 142} In *Schulte*, this court emphasized the importance of the last requirement, stating, "In an action for unliquidated damages, neither the trial court nor any reviewing court has the power to reduce the verdict of a jury or to render judgment for a lesser amount *without the consent to such reduction of the party in whose favor the verdict was rendered*." (Emphasis added.) 120 Ohio St. at 290, 166 N.E. 186. In fact, absent the consent of the party, a judicially ordered remittitur violates that party's right to a jury trial. See, for example, *Hetzel v. Prince William Cty.* (1998), 523 U.S. 208, 211, 118 S.Ct. 1210, 140 L.Ed.2d 336, a per curiam decision in which the court stated that a "Court of Appeals' writ of mandamus, requiring the District Court to enter judgment for a lesser amount than that determined by the jury *without allowing petitioner the option of a new trial*, cannot be squared with the Seventh Amendment." (Emphasis added.) Id., citing *Kennon v. Gilmer* (1889), 131 U.S. 22, 29-30, 9 S.Ct. 696, 33 L.Ed. 110.

{¶ 143} R.C. 2315.18 does not resemble remittitur in any of these respects, as it arbitrarily establishes, without the consideration of any facts in any particular case, that a jury's award for noneconomic damages is excessive when it exceeds the statutory limit. More important, the statute reduces such a verdict without the consent of the party in whose favor the verdict was returned. Thus,

the constitutionality of the remittitur doctrine does not support the conclusion that R.C. 2315.18 is constitutional.

{¶ 144} The majority also refers to several statutes that provide for treble damages found by a jury, and it reasons that if "[w]e have never held that the legislative choice to *increase* a jury award as a matter of law infringes upon the right to a trial by jury," then "the corresponding *decrease* as a matter of law cannot logically violate that right." (Emphasis sic.) I disagree, however, because a statutory damages multiplier is fundamentally different from the damages cap imposed by R.C. 2315.18.

{¶ 145} In enacting R.C. Chapter 1345, the Consumer Sales Practices Act ("CSPA"), for example, the General Assembly created a statutory cause of action to address a specific public policy, part of which is to punish violators and to deter future violations by allowing recovery of treble damages. As the United States Supreme Court has stated, in *Texas Industries, Inc. v. Radcliff Materials, Inc.* (1981), 451 U.S. 630, 639, 101 S.Ct. 2061, 68 L.Ed.2d 500, "[t]he very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct, not to ameliorate the liability of wrongdoers."

{¶ 146} Thus, the CSPA increases the damages found by a jury with respect to a *statutory* cause of action in keeping with the *punitive* nature of the legislation. This has no similarity, however, to R.C. 2315.18, which applies to *common-law* causes of action and precludes a court from journalizing a judgment in conformity with a jury finding regarding *compensatory* damages in excess of the statutory limit. In my view, therefore, the fact that some statutes permit treble damages does not support the conclusion that the statutory cap on noneconomic damages is constitutional.

{¶ 147} Lastly, the majority cites *Estate of Sisk v. Manzanares* (D.Kan.2003), 270 F.Supp.2d 1265, which held that "statutory damage caps do not violate the Seventh Amendment [to the United States Constitution], largely

because a court does not 'reexamine' a jury's verdict or impose its own factual determination regarding what a proper award might be. Rather, the court simply implements a legislative policy decision to reduce the amount recoverable to that which the legislature deems reasonable." Id. at 1278. As the United States Supreme Court has held, however, the Seventh Amendment to the United States Constitution does not apply to the states. See *Minneapolis & St. Louis RR. Co. v. Bombolis* (1916), 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961. Thus, even though jurisprudence concerning the Seventh Amendment may be relevant, it is primarily the Ohio Constitution and this court's precedent that guides our analysis of the right to trial by jury in Ohio.

{¶ 148} Moreover, I disagree with the conclusion that the majority draws from *Manzanares*, that the statutory cap on noneconomic damages is constitutional because it does not prevent the jury from performing its constitutional fact-finding role. The statute requires the trial court to *disregard* the jury's findings of noneconomic damages in excess of the statutory limit and to enter judgment pursuant to the legislatively imposed maximum dollar amount. Thus, R.C. 2315.18 renders fact-finding with respect to noneconomic damages in excess of the statutory limit a meaningless exercise. In this regard, R.C. 2315.18 operates no differently than the statute that this court held unconstitutional in *Sorrell* because it authorized trial courts to "enter judgments in disregard of the jury's verdict and thus violate[d] the plaintiff's right to have all facts determined by the jury, including damages." *Sorrell*, 69 Ohio St.3d at 422, 633 N.E.2d 504.

{¶ 149} The supreme courts of other states have invalidated statutory damages caps for comparable reasons. In *Moore v. Mobile Infirmary Assn.* (1991), 592 So.2d 156, 164, the Supreme Court of Alabama stated as follows with respect to similar legislation that it held in violation of the right to trial by jury: "Because the statute caps the jury's verdict automatically and absolutely, the jury's function, to the extent the verdict exceeds the damages ceiling, assumes

*less* than an advisory status." (Emphasis sic.) Further, in *Sofie v. Fibreboard Corp.* (1989), 112 Wash.2d 636, 655, 771 P.2d 711, the Washington Supreme Court held that a legislative cap on noneconomic damages violated the state's right-to-jury-trial provision and rejected an argument similar to the majority's conclusion, here, stating, "Respondents essentially are saying that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment. *Such an argument pays lip service to the form of the jury but robs the institution of its function*." (Emphasis added.) See also *Knowles ex rel. Knowles v. United States (In re Certification of Questions of Law)*, 1996 SD 10, 544 N.W.2d 183; *Lakin v. Senco Prods., Inc*. (1999), 329 Ore. 62, 987 P.2d 463; *Smith v. Dept. of Ins*. (Fla.1987), 507 So.2d 1080.

{¶ 150} For these reasons, I am of the view that the cap on noneconomic damages established by R.C. 2315.18 violates the right to a jury trial as provided by Section 5, Article I of the Ohio Constitution. Accordingly, I dissent from that portion of the majority opinion.

{¶ 151} I also write to address the position advanced in Justice Cupp's concurring opinion to the effect that the statutory cap on noneconomic damages does not violate Ohio's constitutional right to a jury trial because "[t]he [legislature's] power to alter or abolish a common-law cause of action necessarily includes the power to modify an associated remedy."

{¶ 152} The concurrence cites precedent that the legislature may abolish or modify a common-law cause of action without violating due process and/or equal protection. See, e.g., *Strock v. Pressnell* (1988), 38 Ohio St.3d 207, 214, 527 N.E.2d 1235; *Leis v. Cleveland Ry. Co.* (1920), 101 Ohio St. 162, 128 N.E. 73. These cases, however, do not address the right to a jury trial provided by Section 5, Article I of the Ohio Constitution. This is an important distinction because the Constitution guarantees that where a party has a cause of action, it is entitled to have damages determined by a jury. *Sorrell*, 69 Ohio St.3d at 422, 633

N.E.2d 504. Thus, while it may be argued that the General Assembly may abolish a common-law cause of action in its entirety without violating due process or equal protection, that reasoning does not imply that the legislature may establish by statute the maximum amount a litigant may recover where the Constitution provides that a litigant has the right to have a jury make that determination.

{¶ 153} Here, R.C. 2315.18 abolishes neither a cause of action nor any right to recovery in its entirety. Instead, the statute places a specific limit on a party's noneconomic damages based on the General Assembly's judgment of what the maximum amount of recovery for a prevailing party should be, and in this way it has substituted its judgment for that of a jury in violation of Section 5, Article I of the Ohio Constitution. I agree with the reasoning of the Washington Supreme Court in *Sofie*, 112 Wash.2d at 652, 771 P.2d 711, which stated, "As long as the cause of action continues to exist and the litigants have access to a jury, that right of access remains as long as the cause of action does." See also *Moore v. Mobile Infirmary Assn.*, 592 So.2d 156.

{¶ 154} Finally, the concurring opinion laments that it has been provided no historical analysis to support the contention that "the amount of damages recoverable under a common-law cause of action cannot be limited by action of the legislature because determining the amount of damages is reserved to the jury by the constitutional right to trial by jury." In support of its contrary position, the concurrence provides authority that the constitutional right to a jury trial originated in response to what it terms "judicial overreaching." This analysis, however, does not suggest that any other branch of government may overreach and interfere with the right to a jury trial or predetermine by legislation that which the Constitution has specified will be decided by jurors. Furthermore, notwithstanding that we have already held, in *Sorrell*, that the legislature may not encroach upon a party's right to have a jury determine the amount of compensatory damages, the historical basis for preventing legislative intrusion on

a party's right to a jury trial exists in the language of Section 5, Article I of the Ohio Constitution, adopted in 1802: "The right of trial by jury shall be inviolate * * *."

{¶ 155} This constitutional language, and the right it affords litigants in Ohio, has been understood since its incorporation into the Ohio Constitution. As discussed by Judge Ranney in his majority opinion, speaking of the right to a jury of 12 in a criminal trial in *Work v. State* (1853), 2 Ohio St. 296, 302:

{¶ 156} "What, then, is this right? It is nowhere defined or described in the constitution. It is spoken of as something already sufficiently understood, and referred to as a matter already familiar to the public mind. * * * The constitution furnishes no answer, nor was it necessary that it should. If ages of uninterrupted use can give significance to language, the right of jury trial and the habeas corpus stand as representatives of ideas as certain and definite as any other in the whole range of legal learning."

{¶ 157} In his opinion, Judge Ranney noted that the Northwest Ordinance of 1787 "made an unalterable article of compact, that 'the inhabitants of the said territory shall always be entitled to the benefit of the writ of habeas corpus, and of the trial by jury,' " id. at 303, quoting Section 14, Article II of the Northwest Ordinance, and he alluded to traces of the right being "found in the laws of all those nations which adopted the feudal system, 'who had all of them a tribunal composed of twelve good men and true.' " Id. at 303-304.

{¶ 158} Judge Ranney stated that "it is beyond the power of the General Assembly to impair the right, or materially change its character; that the number of jurors cannot be diminished, or a verdict authorized short of a unanimous concurrence of all the jurors. It follows that the act under which this conviction was obtained, in so far as it provides for a jury of six only, and authorizes a conviction upon their finding, is unconstitutional and void." Id. at 306.

{¶ 159}  In concluding the opinion, the court stated, "We have deemed it our duty to meet and arrest, at the outset, what we cannot but regard as an infringement of a great constitutional right – not in a very flagrant manner, but, nevertheless, opening the door to further encroachments."  Id.

{¶ 160}  In *Gibbs v. Girard* (1913), 88 Ohio St. 34, 102 N.E. 299, which quoted extensively, with approval and admiration, from Judge Ranney's opinion in *Work*, this court reaffirmed the right to have a jury determine *every* question of disputed fact in civil cases and stated that "[t]o hold otherwise would not only commit but permit, in a multitude of cases, a sinister and indirect invasion and usurpation of the right of trial by jury.  A legislative act impairing it would be clearly unconstitutional."  Id. at 43, 102 N.E. 299.

{¶ 161}  The syllabus in *Gibbs* summarizes the case, holding as follows: "The right of trial by jury, being guaranteed to all our citizens by the constitution of the state, cannot be invaded or violated by either legislative act or judicial order or decree."  Id. at paragraph two of the syllabus.

{¶ 162}  Accordingly, it is my view that R.C. 2315.18, which substitutes the judgment of the General Assembly for that of a jury, violates Section 5, Article I of the Ohio Constitution and therefore is unconstitutional and opens the door to further encroachments.  Therefore, I dissent from that portion of the majority opinion.

_____

**PFEIFER, J., dissenting.**

I.  R.C. 2315.18

A.  Right to Trial by Jury

{¶ 163}  "So long as the trial by jury is a part of our system of jurisprudence, its constitutional integrity and importance should be jealously safeguarded.  The right of trial by jury should be as inviolate in the working of our courts as it is in the wording of our Constitutions."  *Gibbs v. Girard* (1913),

88 Ohio St. 34, 47, 102 N.E. 299.  Instead of jealously safeguarding the right to trial by jury, the majority opinion in this case eviscerates it by holding constitutional a statute that enables courts to "enter judgments in disregard of the jury's verdict." *Sorrell v. Thevenir* (1994), 69 Ohio St.3d 415, 422, 633 N.E.2d 504.  Instead of jealously safeguarding the right to trial by jury, the majority opinion employs shallow reasoning and shoddy logic in concluding that juries can meaningfully determine only facts that do not conflict with predetermined assessments of the General Assembly.  Instead of jealously safeguarding the right to trial by jury, the majority opinion "cleans the scalpel for the legislature to cut away unrestrainedly at the whole field of tort redress." *Meech v. Hillhaven W., Inc*. (1989), 238 Mont. 21, 52, 776 P.2d 488 (Sheehy, J., dissenting).

{¶ 164}  The Constitution states that "[t]he right of trial by jury shall be inviolate * * *."  Section 5, Article I, Ohio Constitution.  We have held that "[t]he right of trial by jury, being guaranteed to all our citizens by the Constitution of the state, cannot be invaded or violated by either legislative act or judicial order or decree." *Gibbs*, 88 Ohio St. 34,102 N.E. 299, at paragraph two of the syllabus.  This court has held that "[w]hat the Constitution grants, no statute may take away." *State ex rel. Hoel v. Brown* (1922), 105 Ohio St. 479, 138 N.E. 230, paragraph three of the syllabus.  Thomas Jefferson considered trial by jury "the only anchor ever yet imagined by man, by which a government can be held to the principles of its constitution."  Letter from Thomas Jefferson to Thomas Paine, 1789, http://etext.virginia.edu/jefferson/quotations/jeff1520.htm.  The United States Supreme Court has stated that "[t]he right of trial by jury is of ancient origin, characterized by Blackstone as 'the glory of the English law' * * *.  Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care." *Dimick v. Schiedt* (1935), 293 U.S. 474, 485-486, 55 S.Ct. 296, 79 L.Ed. 603.

{¶ 165} In the face of such forceful and clear language and contrary to many holdings of this court, the majority opinion concludes that jury findings of fact can be altered without violating the right to trial by jury. The reasons advanced by the majority opinion to buttress its assault on a fundamental constitutional right are insubstantial, legally unsupported, and in many cases disingenuous. Neither separately nor collectively do they support upholding as constitutional a statute that infringes upon the right to trial by jury.

{¶ 166} The majority states that "[s]o long as the [jury's] fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings, awards may be altered *as a matter of law*." (Emphasis sic.) In support for this statement of first impression, the majority offers the irrelevant *Conley v. Shearer* (1992), 64 Ohio St.3d 284, 595 N.E.2d 862. In *Conley*, Kurt Shearer argued that he was immune from liability because he was a governmental employee. Whether Shearer was entitled to immunity was deemed a question of law that was not triable to a jury. Id. at 292. It is impossible to determine why the majority cites this case to support its decision to allow a statute to circumvent what the majority itself calls "one of the most fundamental and long-standing rights in our legal system, having derived originally from the Magna Carta."

{¶ 167} The majority next states that there are "several ways in which a court may apply the law to change a jury award of damages without running afoul of the Constitution" and that among these is remittitur. Though the majority opinion notes parenthetically that a plaintiff must consent to remittitur, it does not explain that the sole reason remittitur does not violate the right to a trial by jury is that remittitur cannot be granted without the consent of the prevailing party. See, e.g., *Wightman v. Consol. Rail Corp.* (1999), 86 Ohio St.3d 431, 444, 715 N.E.2d 546. Thus, although remittitur is grounded in a court's inherent authority to remit an excessive award, it does not infringe upon a plaintiff's right to a trial by jury

because "[n]either the trial court nor any reviewing court has power or authority to reduce a verdict on any grounds without the assent of the prevailing party, unless the undisputed testimony shows an error in mathematical calculation." *Chester Park v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph four of the syllabus. Chief Justice Moyer has stated that a "trial court has only limited authority to offer remittitur." *Wightman,* 86 Ohio St.3d at 446 (Moyer, C.J., dissenting). That limited authority is now offered as a basis for holding that courts may alter a jury award, even when a new trial is not an option.

{¶ 168} The majority opinion next states that because the treble-damages provisions of R.C. 901.51, 1331.08, 1345.09, 2307.61, 2923.34(E), and 4905.61, which increase a jury award, have never been held to infringe the right to a trial by jury, R.C. 2315.18, which can decrease a jury award, "cannot logically violate that right." The fact that we have not declared a statute unconstitutional does not mean that a similar statute is automatically constitutional. There are many potential reasons that this court has never held treble-damages provisions to be constitutional or unconstitutional. Perhaps the issue has never been raised or properly before this court. Perhaps treble damages are unconstitutional. Perhaps treble damages are a penalty, not damages, as five members of the majority recently ruled with respect to R.C. 4905.61, in *Cleveland Mobile Radio Sales, Inc. v. Verizon Wireless*, 113 Ohio St.3d 394, 2007-Ohio-2203, 865 N.E.2d 1275, at ¶ 19. Whatever the reason, one thing is clear: the majority opinion's discussion of this issue is superficial or disingenuous.

{¶ 169} The majority next states that R.C. 2315.18 is nothing more than a policy choice by the General Assembly. A jury award for noneconomic damages in excess of the limit imposed by R.C. 2315.18 will be reduced automatically by the judge as a matter of law. According to the majority opinion, that reduction does "not alter the findings of facts themselves." The members of the majority profess to believe that because the findings of fact are ignored, not changed, the

requirements of the Constitution have been observed. See *Sofie v. Fibreboard Corp.* (1989), 112 Wash.2d 636, 655, 771 P.2d 711 ("saying that the right to trial by jury is not invaded if the jury is allowed to determine facts which go unheeded when the court issues its judgment * * * pays lip service to the form of the jury but robs the institution of its function"). This court has never before paid mere lip service to the right to trial by jury. In *Galayda v. Lake Hosp. Sys., Inc.* (1994), 71 Ohio St.3d 421, 425, 644 N.E.2d 298, we stated that the right to trial by jury includes "the right to have a jury determine all questions of fact, including the amount of damages to which the plaintiff is entitled." Chief Justice Moyer, the author of today's majority opinion, has written that "the right to a trial by jury includes a determination by the jury of all questions of fact, as well as the amount of compensatory damages to which the plaintiff is entitled." *Galayda* at 436 (Moyer, C.J., dissenting). But today, Chief Justice Moyer concludes that the Constitution protects "a determination by the jury * * * of compensatory damages to which the plaintiff is entitled" only as long as the damages do not exceed a limit predetermined by the General Assembly. According to the majority opinion, the Ohio Constitution does little more than enable the jury to determine facts — what a judge does with those factual determinations is of no constitutional consequence. Plainly, the majority doesn't think the right to a trial by jury entitles a plaintiff to much protection. The founding fathers thought much more highly of the right. Among the "repeated injuries and usurpations" which caused them to declare their independence from the King of England was his refusal to confer "the benefits of Trial by Jury." Declaration of Independence, July 4, 1776. Ignoring factual findings is the equivalent of changing them. Ignoring factual findings is the equivalent of rendering those findings impotent. See *Lakin v. Senco Prods., Inc.* (1999), 329 Ore. 62, 79, 987 P.2d 463 ("to the extent that the jury's award exceeds the statutory cap, the statute prevents the jury's award from having its full and intended effect"). However you characterize it, a statute that

authorizes a judge to ignore or change factual findings deprives litigants "of the benefits of Trial by Jury" and must be declared unconstitutional.

{¶ 170} If a damages cap of $250,000 is constitutional – the majority opinion mentions the amount, but never discusses it, apparently giving it no significance – why can't the General Assembly limit damages for claims they do not favor to $100,000? Or $1,000? Or $10? Under this court's reasoning, there is nothing in the Ohio Constitution to restrain the General Assembly from limiting noneconomic damages to $1. In essence, the power to cap noneconomic damages is the power to eliminate them. But the General Assembly does not have this power; only the people by the amendment process have this power. After today, what meaning is left in a litigant's constitutional right to have a jury determine damages?

{¶ 171} The majority opinion next states that R.C. 2315.18 "is distinguishable" from the statutes declared unconstitutional in *Sorrell* and *Galayda*, but it does not explain how. In *Galayda*, a statute was declared unconstitutional because it allowed payment of a jury award over a period of years, thus invading "the jury's province to determine damages, and [violating] a plaintiff's right to trial by jury." Id., 71 Ohio St.3d at 425-426, 644 N.E.2d 298. In the instant case, a statute authorizes a judge to reduce a jury award. The statutes in question have the same result, differing in degree only: both decrease the real value of a damages award. One statute was held unconstitutional, the other "is distinguishable." Referring to *Galayda*, one of the amicus briefs asks, "[W]hy is it *unconstitutional* to impose payments by installment on a total verdict of $1,396,125, but at the same time constitutional to flatly reduce that same verdict by over $1,000,000?" (Emphasis sic.) The brief characterizes this inconsistency as an "impenetrable conundrum." And so it will remain, because the majority opinion does not explain the putative distinguishing features. The distinction between the statute in *Sorrell*, which was held unconstitutional

because, as the majority today admits, it "allow[ed] courts to substitute their own findings of fact on collateral benefits," and the statute here, which allows courts to ignore the jury's findings of facts on damages, also is unexplained by the majority. See *Sorrell*, 69 Ohio St.3d at 422, 633 N.E.2d 504 ("courts may, consistent with R.C. 2317.45, enter judgments in disregard of the jury's verdict and thus violate the plaintiff's right to have all facts determined by the jury, including damages").

{¶ 172} Finally, with respect to the right to trial by jury, the majority states that these limitations are constitutional under the "Seventh Amendment right to a jury trial in the federal system," citing *Estate of Sisk v. Manzanares* (D.Kan.2003), 270 F.Supp.2d 1265. Although possibly accurate, this assessment is not supported by citation of a case from the United States Supreme Court and is contrary to *Dimick*, 293 U.S. at 480, 55 S.Ct. 296, 79 L.Ed. 603, in which the United States Supreme Court, quoting Mayne's Treatise on Damages (9th Ed.1920) 571, stated that " 'in cases where the amount of damages was uncertain their assessment was a matter so peculiarly within the province of the jury that the Court should not alter it.' " *Estate of Sisk* is, with all due respect to the members of the majority and the district court magistrate in Kansas who wrote it, wholly irrelevant. Our task today is to decide whether R.C. 2315.18 violates Section 5, Article I of the Ohio Constitution. That a federal district court judge in Kansas has determined that a federal statute does not violate the Seventh Amendment is beside the point.

{¶ 173} To summarize, the majority opinion concludes that R.C. 2315.18 does not infringe upon the constitutional right to trial by jury. It reaches that conclusion by relying on (1) an irrelevant case, (2) remittitur, which supports a contrary conclusion, (3) a patently superficial argument, (4) a policy-trumps-the-Ohio-Constitution argument, (5) an unexplained argument that two prior cases are distinguishable, and (6) an irrelevant citation of a federal trial court case. It isn't

much of an explanation. Actually, it's nothing. But these six paltry reasons are the only justification the majority provides to support its decision to uphold the constitutionality of a statute that requires judges to arbitrarily diminish a jury's factual finding of damages.

{¶ 174} I would hold that R.C. 2315.18 is unconstitutional because it infringes on the constitutional right to a trial by jury. It does so by intruding on the plaintiff's right to have a jury meaningfully determine damages. I believe that a statute that automatically reduces a jury's factual determination of damages to an arbitrary level, no matter how high that level might be, violates the constitutional right to trial by jury.

B. Due Process and Equal Protection

{¶ 175} Even though there is no need to go further with respect to R.C. 2315.18, some of the majority opinion's other arguments necessitate further discussion. For example, the majority opinion introduces Arbino's due-process argument by stating that "[b]ecause we have already concluded that R.C. 2315.18 violates neither the right to a jury trial nor the right to a remedy, we must find it valid" if it satisfies the rational-basis test. Applying the rational-basis test in this instance is contrary to our approach in *Sorrell*, in which we stated that "the right to a jury trial in negligence and personal injury actions is a fundamental right. Thus in order to determine whether R.C. 2317.45 [part of the Tort Reform Act of 1987] violates the Due Process Clause of the Ohio Constitution, a strict scrutiny standard of review applies." Id. at 423, 633 N.E.2d 504. In *Morris v. Savoy* (1991), 61 Ohio St.3d 684, 689, 576 N.E.2d 765, a case in which Chief Justice Moyer was a member of the majority, this court applied the rational-basis test only because the case "did not involve a fundamental right or suspect class." See also *State ex rel. Ohio Academy of Trial Lawyers v. Sheward* (1999), 86 Ohio St.3d 451, 486, 715 N.E.2d 1062, fn. 14 ("a finding that the right to trial by jury was implicated would have invoked a higher level of judicial scrutiny [than

rational basis] for purposes of the due process analysis"). The majority opinion does not address this language from *Sorrell, Savoy,* or *Sheward* even though it is exactly on point as to the level of scrutiny to be applied to R.C. 2315.18.

{¶ 176} Instead, the majority opinion applies the rational-basis test, and concludes that R.C. 2315.18 is rationally related to a legitimate government purpose. I believe that it is more appropriate to apply strict scrutiny to R.C. 2315.18, invalidating it unless it is "necessary to promote a compelling governmental interest," *Morris*, 61 Ohio St.3d at 705, 576 N.E.2d 765, citing *Shapiro v. Thompson* (1969), 394 U.S. 618, 634, 89 S.Ct. 1322, 22 L.Ed.2d 600. Even applying a rational-basis test, however, it is clear that there is no objective reason to conclude that R.C. 2315.18 is rationally related to a legitimate government purpose. My analysis begins with an examination of the General Assembly's findings to establish how unrelated they are to the general welfare of Ohioans.

{¶ 177} "The General Assembly makes the following statement of findings and intent:

{¶ 178} "(A) The General Assembly finds:

{¶ 179} "(1) The current civil litigation system represents a challenge to the economy of the state of Ohio, which is dependent on business providing essential jobs and creative innovation.

{¶ 180} "(2) The General Assembly recognizes that a fair system of civil justice strikes an essential balance between the rights of those who have been legitimately harmed and the rights of those who have been unfairly sued.

{¶ 181} "(3) This state has a rational and legitimate state interest in making certain that Ohio has a fair, predictable system of civil justice that preserves the rights of those who have been harmed by negligent behavior, while curbing the number of frivolous lawsuits, which increases the cost of doing business, threatens Ohio jobs, drives up costs to consumers, and may stifle

innovation." 2004 Am.Sub.S.B. No. 80, Section 3, 150 Ohio Laws, Part IV, 8024.

{¶ 182} Section 3(A)(2) doesn't make sense. It states that a fair system of civil litigation, presumably one that includes R.C. 2315.18, should balance the rights of the legitimately harmed with the rights of the unfairly sued. The rights of people who have been harmed and who prove the legitimacy of their case by prevailing in a trial cannot be balanced against the rights of the unfairly sued. They are mutually exclusive groups – people harmed by the tortious conduct of others don't *unfairly* sue. In imposing caps, R.C. 2315.18 decreases the protection afforded to legitimate plaintiffs yet does nothing to protect the unfairly sued. Where is the fairness in that system?

{¶ 183} The predictability of the new system implicitly touted in the findings results solely from the arbitrary and, in my view, unconstitutional diminishment of a jury's factual findings of damages.

{¶ 184} That Section 3(A)(3) of Am.Sub.S.B. No. 80 mentions frivolous lawsuits is somewhat surprising, because nothing in the statutory scheme addresses frivolous lawsuits, and damages caps are not even remotely related to frivolous lawsuits. The caps imposed by the statutory scheme can affect only those plaintiffs with meritorious claims, plaintiffs who have prevailed in a trial and who have suffered significant damages. These plaintiffs are exactly the opposite of those who file frivolous lawsuits. Finally, although Section 3(A)(3) lists a series of detrimental effects caused by frivolous lawsuits, nothing in the section suggests that excessive damages awards, the putative target of R.C. 2315.18, cause similar detrimental effects.

{¶ 185} The tort system in Ohio is far from perfect. The various trial and defense attorneys involved in our tort system are not perfect either. There is no doubt much room for improvement in the way the tort system in Ohio functions. For instance, our tort system would better serve the public if frivolous lawsuits

were never filed and if excessive paper-churning, fee-building discovery practices were curtailed. There is no rational reason to "improve" the tort system in Ohio at the sole expense of a small group of people who are able to prove that they suffered damage significant enough to exceed the damages caps imposed by the General Assembly. Whatever improvement the tort system in Ohio needs, the Ohio Constitution should remain inviolate, unless properly amended.

{¶ 186} My analysis continues with an examination of the evidence the General Assembly relied on to support its findings to determine whether they bear "a reasonable and substantial relation to the public welfare." *State ex rel. Bowman v. Allen Cty. Bd. of Commrs.* (1931), 124 Ohio St. 174, 177 N.E. 271, paragraph three of the syllabus. See also Tocqueville, Democracy in America (Heffner Ed.1956) 76 ("the power vested in the American courts of justice, of pronouncing a statute to be unconstitutional, forms one of the most powerful barriers which has ever been devised against the tyranny of political assemblies").

{¶ 187} Uncodified Section 3 of Am.Sub.S.B. No. 3 further states:

{¶ 188} "The General Assembly bases its findings on this state interest upon the following evidence:

{¶ 189} "(a) A National Bureau of Economic Research study estimates that states that have adopted abuse reforms have experienced employment growth between eleven and twelve per cent, productivity growth of seven to eight per cent, and total output growth between ten and twenty per cent for liability reducing reforms.

{¶ 190} "(b) According to a 2002 study from the White House Council of Economic Advisors, the cost of tort litigation is equal to a two and one tenth per cent wage and salary tax, a one and three tenth per cent tax on personal consumption, and a three and one tenth per cent tax on capital investment income.

{¶ 191} "(c) The 2003 Harris Poll of nine hundred and twenty-eight senior corporate attorneys conducted by the United States Chamber of

Commerce's Institute for Legal Reform reports that eight out of ten respondents claim that the litigation environment in a state could affect important business decisions about their company, such as where to locate or do business. In addition, one in four senior attorneys surveyed cited limits on damages as one specific means for state policy makers to improve the litigation environment in their state and promote economic development.

{¶ 192} "(d) The cost of the United States tort system grew at a record rate in 2001, according to a February 2003 study published by Tillinghast-Towers Perrin. The system, however, failed to return even fifty cents for every dollar to people who were injured. Tillinghast-Towers Perrin also found that fifty-four per cent of the total cost accounted for attorney's fees, both for plaintiffs and defendants, and administration. Only twenty-two per cent of the tort system's cost was used directly to reimburse people for the economic damages associated with injuries and losses they sustain.

{¶ 193} "(e) The Tillinghast-Towers Perrin study also found that the cost of the United States tort system grew fourteen and three tenths of a per cent in 2001, the highest increase since 1986, greatly exceeding overall economic growth of two and six tenth per cent. As a result, the cost of the United States tort system rose to two hundred and five billion dollars total or seven hundred and twenty-one dollars per citizen, equal to a five per cent tax on wages.

{¶ 194} "(f) As stated in testimony by Ohio Department of Development Director Bruce Johnson, as a percentage of the gross domestic product, United States tort costs have grown from six tenths of a per cent to two per cent since 1950, about double the percentage that other industrialized nations pay annually. These tort costs put Ohio businesses at a disadvantage vis-a-vis foreign competition and are not helpful to development." Section 3(A)(3), Am.Sub.S.B. No. 80, 150 Ohio Laws, Part IV, 8024.

{¶ 195} The evidence in Section 3(A)(3) is not objective, not peer-reviewed, not Ohio-specific, and, in most cases, significantly flawed. First, apart from a couple of anecdotes, the findings do not relate specifically to Ohio. On that ground alone it is unreasonable to conclude that R.C. 2315.18 is rationally related to the general welfare of Ohioans.

{¶ 196} Second, most of the findings are the product of biased sources. The National Bureau of Economic Research ("NBER") study cited in Section 3(A)(3)(a) was produced by an organization that calls itself "a private, nonprofit, nonpartisan research organization dedicated to promoting a greater understanding of how the economy works." Seehttp://www.nber.org/info.html. But see http://www.mediatransparency.org/recipientgrants.php?recipientID=243, which suggests that NBER's source of funding is not nonpartisan. The White House Council of Economic Advisors study cited in Section 3(A)(3)(b) is the work product of three political appointees. See http://www.whitehouse.gov/cea/. The 2003 Harris Poll of 928 attorneys cited in Section 3(A)(3)(c) is a survey solely of corporate attorneys. The Tillinghast-Towers Perrin 2003 study cited in Section 3(A)(3)(d) and (e) was produced by a company whose business is to "provide[] consulting and software solutions to insurance and financial services companies." See *http://www.towersperrin.com/tp/jsp/masterbrand_html.jsp?webc=176/global/* about/about.htm&selected=about. Bruce Johnson, the director of the Ohio Department of Development, whose testimony is cited in Section 3(A)(3)(f), is a political appointee.

{¶ 197} In short, none of the evidence is the product of authentic, objective research. See Abaray, Déjà Vu All Over Again: Ohio's 2005 Tort Reform Act Cannot Survive a Rational Basis Challenge (2006), 31 U.Dayton L.Rev. 141. The National Bureau of Economic Research Study is not peer-reviewed and is not published in a scholarly journal. Id. at 154. The authors purport to rely on empirical evidence from states that have instituted tort reform,

but it is impossible to verify the reliability of their conclusions. The authors themselves concede that although their results " 'are consistent with the hypothesis that reductions in liability from the current common-law levels improve efficiency, * * * the results are also consistent *with three other alternative hypotheses*.' " (Emphasis added.) 31 U.Dayton L.Rev. at 154, quoting the NBER study at 28, fn. 65. It would be difficult to summarize the study better than the author of the Dayton Law Review article did: "[I]n relying upon this report, the General Assembly cites as a basis for upsetting 200 years of common law a flawed study, which is not peer reviewed, has no indicia of reliability, omits referenced data, and reaches a conclusion that can be due to any of four different factors. Moreover, the authors base their analysis on national data from 1969 through 1990, providing scant relevance to Ohio law in 2005 * * *." 31 U.Dayton L.Rev. at 154-155.

{¶ 198} The 2002 study by the White House Council of Economic Advisors is also not peer-reviewed, is not published in a scholarly journal, and is not even a study — it is a white paper. "A *white paper* is generally understood to be a position or policy paper of an organization. As such, white papers do not purport to represent an objective review of empirical data." (Emphasis sic.) Id. at 155. Further, this "study" contains several empirical flaws, too detailed to explain here, and is based on the Tillinghast report, which, as explained below, is itself flawed. See id. at 156.

{¶ 199} The 2003 Harris Poll of 928 senior corporate attorneys is just that: a poll. Does this even need to be explained? It should surprise no one that corporate attorneys think tort costs are too high; they represent the companies that commit the torts and, therefore, pay the costs. Anyone who would cite a poll of senior corporate attorneys as an excuse for enacting pro-corporate legislation would probably also cite Charlie Wilson's maxim, "What's good for the country is good for General Motors, and vice versa."

{¶ 200} The 2003 Tillinghast-Towers Perrin study, like the others, is not peer-reviewed, is not from a scholarly journal, and contains many flaws. 31 U.Dayton L.Rev. at 158. For instance, the conclusions the study draws are based in part on the inclusion of the costs of medical malpractice. Id. A study that includes the costs of medical malpractice cannot rationally be used to justify enacting R.C. 2315.18, which expressly does not apply to medical-malpractice claims. R.C. 2315.18(A)(7). The study "also cites increases in the cost of medical care as a cause for an increase in jury verdict awards." Id. at 159. Medical costs are economic costs, which are outside the purview of R.C. 2315.18.

{¶ 201} The General Assembly relies on the Tillinghast study's conclusion that the "cost of the United States tort system grew at a record rate in 2001," specifically, 14.4 percent. Id. at 158. Even if that statement is true, and there is no particular reason to believe that it is, it is highly selective. The same study indicates that the cost of the national tort system grew only 3.3 percent throughout the 1990s, a much lower rate than in the previous four decades, and that the growth rate of the tort system was only 5.4 percent in 2003. 31 U.Dayton L.Rev. at 159, quoting a 2004 Tillinghast update on nationwide tort costs. Further, those rates of increase include the cost of medical-malpractice awards, to which R.C. 2315.18 does not apply. There is no rational relationship between this flawed study of the national tort system and R.C. 2315.18.

{¶ 202} The Tillinghast study and the General Assembly include the cost of defense litigation in determining the percentage of money paid to plaintiffs.[12] Id. at 159. Section 3(A)(3)(d) states that "[o]nly twenty-two per cent of the tort system's cost was used directly to reimburse people for the economic damages associated with injuries and losses they sustain." That has a certain ring of truth,

_____

12. Including the cost of litigation in a study can yield bizarre results. For instance, in one case a defendant spent approximately $75 million to defend itself against a $400,000 damages award. See *Cipollone v. Liggett Group, Inc*. (1992), 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed2d 407; Rabin, The Third Wave of Tobacco Tort Litigation (Sept.2001) 3-5.

but in reality, the statement is grossly misleading. "If the defense and insurance costs are excluded, the Tillinghast figures actually demonstrate that the total amount awarded in tort cases nationwide for economic loss equals 34%, noneconomic loss equals 38%, and claimant attorney fees equals 27% of total awards." 31 U.Dayton L.Rev. at 160; see also Chimerine & Eisenbrey, The Frivolous Case for Tort Law Change: Opponents of the Legal System Exaggerate Its Costs and Ignore Its Benefits (May 17, 2005), Economic Policy Institute Briefing Paper No. 157, at 4-5, available at http://www.epi.org/content. cfm/bp157. The Tillinghast study is misleading, biased, flawed, and disingenuous, and it cannot be the rational basis for enacting a statute in Ohio. Further, the Tillinghast study is impossible to verify because Tillinghast "claims that its data and methodology are 'proprietary.' " Chimerine at 3.

{¶ 203} Last, we come to the testimony of Bruce Johnson. Johnson, a political appointee of a governor who desperately wanted to impose tort reform on all Ohioans, relied extensively on the flawed Tillinghast study. Moreover, other than anecdotal evidence and unverifiable statistics, Johnson's testimony is not related to Ohio. 31 U.Dayton L.Rev. at 162.

{¶ 204} None of the General Assembly's findings are reliable with respect to addressing Ohio-specific problems. First, the findings do not relate specifically to Ohio. Second, all of the proffered evidence is the product of biased sources with political agendas. Third, the studies contain serious flaws, relying either on information that they do not provide or on information (medical-malpractice awards) that is not relevant to R.C. 2315.18. In short, these findings do not support a conclusion that R.C. 2315.18 is rationally related to a legitimate government purpose in Ohio. I conclude that the General Assembly's reliance on this evidence to justify enacting R.C. 2315.18 was arbitrary and unreasonable. Accordingly, R.C. 2315.18 violates due process.

**{¶ 205}** Given these flaws, it is obvious that R.C. 2315.18 cannot withstand equal-protection scrutiny. The majority opinion again applies the rational-basis test, even though it should apply strict scrutiny, and again, R.C. 2315.18 cannot withstand even the less demanding test. The degree of equal-protection scrutiny depends on whether a fundamental right is involved. *Beatty v. Akron City Hosp.* (1981), 67 Ohio St.2d 483, 492, 21 O.O.3d 302, 424 N.E.2d 586 ("once the existence of a fundamental right * * * is shown to be involved, the state must assume the heavy burden of proving that the legislation is constitutional). See *Schwan v. Riverside Methodist Hosp.* (1983), 6 Ohio St.3d 300, 301, 6 OBR 361, 452 N.E.2d 1337 (the rational-basis test was applied because the case did not "involve either a fundamental right or a suspect class"); *Morris*, 61 Ohio St.3d at 689, 576 N.E.2d 765 (citing *Schwan*); *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 13 (classifications that affect a fundamental constitutional right are subject to strict-scrutiny inquiry). Given the deeply flawed nature of the General Assembly's findings, it is clear that, were R.C. 2315.18 subjected to strict scrutiny, it would fail. Further, given my analysis above, it is clear that R.C. 2315.18 cannot withstand even rational-basis scrutiny. The majority opinion reaches a contrary conclusion, stating that "the General Assembly reviewed several studies and other forms of evidence" to justify its conclusions. But as noted, those studies and evidence are so biased, flawed, and insubstantial that reliance on them is arbitrary and unreasonable.

**{¶ 206}** The statutory scheme creates two classes of tort victims: those with catastrophic or minor injuries, who are able to recover the full measure of their damages, and those with significant but not catastrophic injuries, who are able to recover only a portion of their damages. "Equal protection of the laws requires the existence of reasonable grounds for making a distinction between those within and those outside a designated class." *Morris*, 61 Ohio St.3d at 691,

SUPREME COURT OF OHIO

576 N.E.2d 765. Objectively, the classification in this case is not rationally related to anything, let alone a legitimate governmental interest. The majority opinion should explain how this classification is reasonably related to improving business conditions in Ohio. Further, Chief Justice Moyer should explain why his consideration of the caps before us is so radically different from his analysis in *Morris*.

{¶ 207} The majority opinion states that "one cannot deny that noneconomic damage awards are inherently subjective and difficult to evaluate." I agree that "noneconomic damages awards are inherently subjective." So are many of the good things in life, for instance, religion, love, and which college football team to root for. That something is subjective does not make it evil. Further, amounts below the statutory threshold are no less subjective than amounts above the statutory threshold. I also agree that noneconomic-damages awards are "difficult to evaluate." I have great faith in Ohio's jury system; so should the members of the majority, each of whom has extensive experience working with juries, either as a judge or an attorney and, therefore, has good cause to know how diligently and seriously juries approach their task to discover the truth.

{¶ 208} Juries hear the evidence presented, assess the reliability and credibility of the witnesses, and consider the law as presented to them by the trial court. They process this information and determine damages to the best of their ability, and they do it well. This court has stated that because there "is no standard by which * * * pain and suffering may be measured," there is " 'no substitute for simple human evaluation.' " *Fantozzi v. Sandusky Cement Prods. Co.* (1992), 64 Ohio St.3d 601, 612, 597 N.E.2d 474, quoting *Flory v. New York Cent. RR. Co.* (1959), 170 Ohio St. 185, 190, 10 O.O.2d 126, 163 N.E.2d 902. Yet, the majority opinion would take the determination of damages away from juries and replace it with a limit predetermined by a legislative body that has not

reviewed facts, not heard evidence, not weighed the credibility of witnesses, and not considered the law. The majority opinion would replace "simple human evaluation" with judgment from above by the General Assembly.

{¶ 209} I have always had great faith in the ability of Ohio juries to reach just determinations. So apparently does Republican Representative Scott Oelslager. The chairman of the House Judiciary Committee at the time R.C. 2315.18 was enacted, Oelslager held 15 hearings on tort reform and concluded that "there is no systematic runaway-jury problem in Ohio." Cleveland Plain Dealer (Nov. 26, 2004). "According to the latest data available from Jury Verdict Research, a service based in Horsham, Pa., jury awards in Ohio were below national averages from 1996 through 2002." Byczkowski, Reform or Restriction? Cincinnati Enquirer (Nov. 28, 2004) J1. "The median compensatory award – which includes economic and non-economic damages – was $15,000 in Ohio. That's less than half the national median of $37,054 and less than any surrounding state." Id.

{¶ 210} The majority opinion states that "the record here draws a clear connection between limiting uncertain and potentially tainted noneconomic damages awards and the economic problems demonstrated in the evidence." Actually, the General Assembly's findings contain no evidence of tainted damages awards or economic problems – they contain only unsubstantiated conclusions supplied by biased organizations with political agendas. There is also, as shown, no established connection between the General Assembly's nationwide findings and R.C. 2315.18. It should be clear that the General Assembly's findings, which are flawed and not Ohio-specific, and which run counter to the above-cited Ohio-specific statements, are arbitrary and unreasonable and cannot be the rational basis for enacting R.C. 2315.18.

{¶ 211} R.C. 2315.18 is purportedly a pro-business piece of legislation, designed to encourage businesses to move to or expand in Ohio. But the statutory

caps imposed by R.C. 2315.18 would benefit any business located anywhere in the world. In this case, Johnson & Johnson, a New Jersey-based multinational corporation, will be protected by the caps, whether or not it has business operations in Ohio. The Chinese manufacturers of toys containing toxic paint so prominently in the news recently would also be protected. This is a further example of how little rational relationship there is between R.C. 2315.18 and its purported rationale and the general welfare of Ohioans. The only basis for R.C. 2315.18 that I can see is that, as between business interests and the people of Ohio, the legislature prefers business. That is not a constitutional basis on which to found a statute.

{¶ 212} I would hold that R.C. 2315.18 violates due process and equal protection and, therefore, is unconstitutional.

## II. R.C. 2315.21

{¶ 213} In imposing a cap on punitive damages, R.C. 2315.21 suffers from the same flaws with respect to the constitutional right to trial by jury as R.C. 2315.18. It is uncontroverted that "the assessment of punitive damages by the jury stems from the common law and is encompassed within the right to trial by jury." *Zoppo v. Homestead Ins. Co.* (1994), 71 Ohio St.3d 552, 557, 644 N.E.2d 397. Nevertheless, the majority opinion states that R.C. 2315.21 "permits the trier of fact to determine punitive damages. The subsequent application of a statute to this decision does not abrogate the established function of the jury." In *Sheward*, we stated the opposite, that "a statute that allows the jury to determine the amount of punitive damages to be awarded but denies the litigant the benefit of that determination stands on no better constitutional footing than one that precludes the jury from making the determination in the first instance." *Sheward*, 86 Ohio St.3d at 484-485, 715 N.E.2d 1062. The majority opinion does not address this contradiction or any of the other contradictions explained in this dissent. It should provide a nonconclusory explanation of each statement that contradicts a prior

68

statement of this court. Whether the majority opinion applies the supercilious *Galatis* test is irrelevant, but it should definitively overrule cases that it contradicts. See *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256. Even the General Assembly realizes that its new tort-reform statutory scheme is contrary to holdings of this court; otherwise it wouldn't have asked this court to "reconsider its holding on damage caps in *State* [*ex rel. Ohio Academy of Trial Lawyers*] *v. Sheward* (1999), [86] Ohio St.3d 451 [715 N.E.2d 1062] to reconsider its holding on the deductibility of collateral source benefits in *Sorrel[l] v. Thevenir* (1994), 69 Ohio St.3d 415 [633 N.E.2d 504] and to reconsider its holding on statutes of repose in *Brennaman v. R.M.I. Co.* (1994), 70 Ohio St.3d 460 [639 N.E.2d 425]." S.B. 80, Section 3(E), 150 Ohio Laws, Part V, 8031. The majority opinion should overrule the cases it contradicts and comprehensively explain its logic. Characterizing all contrary statements as "dicta" is no substitute for nonconclusory analysis.

{¶ 214} The majority opinion explains that because the jury determines the fact of punitive damages, the subsequent statutorily required diminution of that damages amount does not intrude on the jury's findings. The majority opinion states that the automatic arbitrary diminution of a damages award does not affect the jury's factual determination. "The more one tries to explain this extraordinary result the less another can understand it." *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 14, 19 OBR 8, 482 N.E.2d 583 (Wright, J., dissenting). I would hold that R.C. 2315.21 violates the right to trial by jury because it "impairs the traditional function of the jury in determining the appropriate amount of damages." *Zoppo*, 71 Ohio St.3d at 557, 644 N.E.2d 397 (holding unconstitutional a prior version of R.C. 2315.21, which provided that the court, not the jury, would determine the amount of punitive or exemplary damages).

{¶ 215} Citing *Cooper Industries, Inc. v. Leatherman Tool Group, Inc.* (2001), 532 U.S. 424, 433, 121 S.Ct. 1678, 149 L.Ed.2d 674, the majority opinion

states that "[t]his post-*Sheward* precedent conclusively establishes that regulation of punitive damages is discretionary and that states may regulate and limit them as a matter of law without violating the right to trial by jury." Even if we assume that this statement is an accurate reflection of what the United States Supreme Court held with respect to the Constitution of the United States, it is of little relevance to this case where we are determining whether R.C. 2315.21 violates the right to a trial by jury found in Section 5, Article I of the Ohio Constitution. The "post-*Sheward* precedent conclusively establishes" nothing with respect to Section 5, Article I of the Constitution of Ohio.

{¶ 216} R.C. 2315.21 suffers from the same flaws with respect to due process and equal protection as does R.C. 2315.18. I will not repeat that discussion in toto. But, in summary, R.C. 2315.21 should be subjected to strict scrutiny because it involves or infringes upon a fundamental right. Even if R.C. 2315.21 is subjected to rational-basis scrutiny, the findings of the General Assembly are so flawed, particularly in that they do not relate specifically to Ohio and are not objective or verifiable, that they cannot form the rational basis for enacting legislation in Ohio. The majority opinion states that "the legislative record is thin" with respect to the General Assembly's findings on punitive damages. Even that assessment is too generous. The findings are vaporous and are not rationally related to a legitimate governmental interest.

{¶ 217} "The purpose of punitive damages is not to compensate a plaintiff, but to punish and deter certain conduct." *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 651, 635 N.E.2d 331. See *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 ("punitive damages serve a broader function; they are aimed at deterrence and retribution"). This purpose is undermined by caps, which enable wrongdoers to assess the cost of their malfeasance up front without regard to the individualized damage they cause. See *Tuttle v. Raymond* (Me.1985), 494 A.2d 1353, 1359

70

(flexibility in assessing punitive damages is "necessary to avoid situations where the potential benefits of wrongdoing could outweigh a known maximum liability"); *Palmer v. A.H. Robins Co.* (Colo.1984), 684 P.2d 187, 218 ("If punitive damages are predictably certain, they become just another item in the cost of doing business, much like other production costs, and thereby induce a reluctance on the part of the manufacturer to sacrifice profit by removing a correctible defect"). See also Mallor & Roberts, Punitive Damages: Toward a Principled Approach (1999), 50 Hastings L.J. 969, 995 ("The deterrent effect of punitive damages would be minimized if a person contemplating wrongful conduct could gauge his or her maximum liability in advance").

**{¶ 218}** R.C. 2315.21 is unconstitutional because it infringes on the right to a trial by jury and violates due process and equal protection.

### III. Conclusion

**{¶ 219}** I have a basic philosophical difference with the members of the majority and what they have written in the majority opinion. I believe that the Constitution of Ohio is the fundamental document that protects all Ohioans, not just those with the most lobbying power. I believe that the Constitution says what it says for a reason and that no part of our judicial system exists merely to enable the General Assembly to write around the Constitution. I believe that the Constitution should be altered only by amendment, not by legislative or judicial fiat. I believe that the Ohio Constitution is a CONSTITUTION, not just another statute modifiable at will by the General Assembly. See Tocqueville, Democracy in America (Heffner Ed.1956) 74-75 ("In the United States, the Constitution governs the legislator as much as the private citizen * * *, and it is therefore just that the tribunals should obey the constitution in preference to any law"). If the General Assembly had the courage of its convictions it would submit caps to the voters — that is the proper way to amend the Constitution. See Section 1, Article XVI of the Ohio Constitution. If the members of the majority had the courage of

their convictions, they would not allow the General Assembly to circumvent the amendment process.

{¶ 220} Was there ever any doubt how this case would come out? The members of the majority have long talked about judicial restraint. But, in recent high-profile cases, certain members of the majority rewrote Section 16, Article II of the Ohio Constitution into a sad caricature of itself, see *State ex rel. Ohio Gen. Assembly v. Brunner*, 114 Ohio St.3d 386, 2007-Ohio-3780, 872 N.E.2d 912, and created, in Ohio anyway, the concept of executive privilege, *State ex rel. Dann v. Taft*, 109 Ohio St.3d 364, 2006-Ohio-1825, 848 N.E.2d 472. And today, the members of the majority allow the evisceration of a provision of the Constitution that this court has previously stated should be jealously safeguarded. *Gibbs v. Girard* (1913), 88 Ohio St. 34, 47, 102 N.E. 299.

{¶ 221} Today we learn that "judicial restraint" was code for "the General Assembly can do no wrong when it comes to tort reform." Today is a glorious day for the backers of "judicial restraint." Today is a day of fulfilled expectations for insurance companies and manufacturers of defective, dangerous, or toxic products that cause injury to someone in Ohio. But this is a sad day for our Constitution and this court. And this is a tragic day for Ohioans, who no longer have any assurance that their Constitution protects the rights they cherish. I dissent.

_____

Burg, Simpson, Eldredge, Hersh & Jardine, Janet G. Abaray, Calvin S. Tregre Jr., and Melanie S. Bailey; and Center for Constitutional Litigation, P.C., Robert S. Peck, and Stephen B. Pershing, for petitioner.

Tucker, Ellis & West, L.L.P., Irene C. Keyse-Walker, Benjamin C. Sassé, and Julie A. Callsen, for respondents Johnson & Johnson, Ortho-McNeil Pharmaceutical, Inc., and Johnson & Johnson Pharmaceutical Research & Development, L.L.C.

Marc Dann, Attorney General, Stephen Carney, State Solicitor, and Sharon A. Jennings and Frank M. Strigari, Assistant Attorneys General, for respondent state of Ohio.

Volkema Thomas, L.P.A., and Michael S. Miller; Paul W. Flowers Co., L.P.A., and Paul W. Flowers; Nurenberg, Paris, Heller & McCarthy Co., L.P.A., Anthony E. Turley, and Kathleen J. St. John; Kitrick & Lewis Co., L.P.A., and Mark Kitrick, for amicus curiae Ohio Academy of Trial Lawyers, in support of petitioner.

Bernard K. Bauer Co., L.P.A., and Bernard K. Bauer, for amicus curiae Ohio Chapter of the American Board of Trial Advocates, in support of petitioner on Certified Question No. 1.

Gittes & Schulte, Frederick M. Gittes, and Kathaleen B. Schulte, for amici curiae Ohio Employment Lawyers Association, Ohio NOW Education and Legal Defense Fund, Committee Against Sexual Harassment, Ohio Conference of the NAACP, and Columbus NAACP, in support of petitioner.

Arthur, O'Neil, Mertz & Michel Co., L.P.A., and Dan Michel; Kirby, Thomas, Brandenburg & D'Amico and Michael R. Thomas; Linton & Hirshman and Robert F. Linton Jr.; and Behnke, Martin & Schulte, Richard W. Schulte, and Stephen D. Behnke, for amicus curiae Mothers Against Drunk Driving, in support of petitioner.

Micah Berman and Caris Post, for amicus curiae Tobacco Public Policy Center at Capital University Law School, in support of petitioner.

Kenneth R. Sheets, for amicus curiae Donna Ulliman, in support of petitioner.

Porter, Wright, Morris & Arthur, L.L.P., Joseph W. Ryan Jr., and Colleen L. Marshall, for amicus curiae International Association of Defense Counsel, in support of respondents.

Shook, Hardy & Bacon, L.L.P., Victor E. Schwartz, Mark A. Behrens, and Christopher E. Appel, for amici curiae National Federation of Independent Business Legal Foundation, Chamber of Commerce of the United States of America, National Association of Manufacturers, American Tort Reform Association, National Association of Mutual Insurance Companies, Property Casualty Insurers Association of America, and American Chemistry Council, in support of respondents.

Bricker & Eckler, L.L.P., Kurtis A. Tunnell, Anne Marie Sferra, and Vladimir P. Belo, for amicus curiae Ohio Alliance for Civil Justice, in support of respondents.

Porter, Wright, Morris & Arthur, L.L.P., Carolyn A. Taggart, and J.H. Huebert; Weston Hurd, L.L.P., Ronald A. Rispo, and Daniel A. Richards, for amicus curiae Ohio Association of Civil Trial Attorneys, in support of respondents.

Bricker & Eckler, L.L.P., Catherine Ballard, and Lana Knox, for amici curiae Ohio Hospital Association, Ohio State Medical Association, and Ohio Osteopathic Association, in support of respondents.

Dinsmore & Shohl, L.L.P., Frank C. Woodside III, Mark L. Silbersack, and Melissa L. Korfhage, for amicus curiae Product Liability Advisory Council, Inc., in support of respondents.

_____